[Crim. No. 351.   Fourth Appellate District.—December 13, 1937.]

THE PEOPLE, Respondent, v. EDWARD JORDAN et al., Appellants.

Joseph Seymour for Appellants.

U. S. Webb, Attorney-General, James S. Howie, Deputy Attorney-General, Earl Redwine, District Attorney, and Harry P. Amstutz and Wm. O. Mackey, Deputies District Attorney, for Respondent.

BARNARD, P. J.—In this action seventeen defendants were charged, in an indictment containing fifteen counts, with a number of violations of sections 286 and 288a of the Penal Code, alleged to have been committed on or about March 13, 1937. Count I charged all of the defendants with a conspiracy to violate section 288a. Count II charged all of the defendants with a conspiracy to violate section 286. Counts III to XIV, inclusive, each charged some two of the defend-

ants with a violation of section 288a, and count XV charged two of the defendants with a violation of section 286.

The defendant named in the indictment as Bill Doe was never apprehended, four defendants pleaded guilty to certain counts and the other twelve pleaded not guilty and were tried. A jury found all twelve guilty on the first two counts and found them all guilty as they were respectively charged in the other thirteen counts. A motion for a new trial was denied and ten of those convicted have appealed.

The appellants' briefs contain more than one thousand pages, several hundred being single-spaced. Many points are raised with several hundred incidental claims of error which are not separately stated or treated. A large portion of these briefs is devoted to discrepancies and conflicts which go only to the weight of the evidence and it has been no small task to segregate the points which deserve consideration and the matters material thereto. It is obviously impossible to consider all of the claims of error made, but we shall attempt to pass upon all which by any possibility could affect the result. For obvious reasons we shall omit the sordid details and comment on the evidence only in the most general terms.

The most important question is whether the evidence is sufficient to sustain the verdict and judgment upon the respective counts as affecting the various appellants. Certain general facts appearing in the evidence will first be set forth, followed by a reference to other evidence more particular in nature.

A few weeks prior to March 13, 1937, the operator of a service station on a main highway about five miles easterly from Riverside delivered to the defendant Bill Doe a key to a cabin which is located in a secluded spot on a side road about a mile from the service station. A short distance to the rear of this cabin is a sort of ravine and at another point a drainage ditch. The cabin is about 23x17 feet in size and contains four rooms and a bathroom. Across the front, which is the long way of the cabin, is a living room and a small kitchen. To the rear of these is a bedroom about 10x8 feet in size, another bedroom about 8x8, and between them a small bathroom about 5 feet square with a small hall about three feet wide, which gives access from the living room to both bedrooms and the bathroom. The partitions between the various rooms do not extend up to the roof and there was no ceiling

over any of the rooms, except in one place which covered about one-third of the living room and extended for a distance of a foot over one of the bedrooms and over a small corner of the hallway. There was a switch near the front door which turned on electric lights in all of the rooms, after which the light in any particular room could be turned off or on. There was some furniture in the cabin, including a day cot in the living room, a double bed in one of the bedrooms and two single beds in the other.

The operator of the service station reported to the sheriff's office that he had noticed quite a few cars going in toward the cabin late at night. A deputy sheriff and an officer of the military police at March Field investigated and on the evening of March 4th, observed an automobile go up the road and stop at this cabin. The lights in the cabin were turned on and the car remained for some forty-five minutes. The officers followed the car as it left the premises and it was driven to a place in Riverside where two of these defendants lived, and two men got out of the car and entered the house. On the afternoon of March 5th, the officers obtained a duplicate key to the cabin, entered the same, made an examination of it, and punched out some knots in boards which were over the windows so that they might later observe what went on in the cabin. On the evening of March 6th four officers went to the premises and concealed themselves in the drainage ditch to the rear of the cabin. During that evening four cars drove up and twelve men entered the cabin, including nine of these defendants. The lights were turned on and a radio was taken into the cabin and hooked up. There followed what is referred to in the record as a party. There was some drinking and some dancing, and two of the men were dressed in women's clothes. At various times during the evening the officers observed certain of the persons present entering the various bedrooms, at times the light in a bedroom was turned out, at times the lights in the entire house were turned out, and at such times there was considerable screaming "like women screaming". Early in the evening two of the men came outside of the cabin and embraced each other and the officers heard one of them say to the other that this was a marvelous place, that "no one would ever think of coming up here" and that everything was perfectly safe. During the evening several of the men came outside and

peeked in at various knot holes. On one occasion another man came out and told them to stop this as they would not like others peeking at them under similar circumstances. The officers heard someone make an announcement that one of the defendants would give a hula hula dance and a little later the announcement was made that another person ''will now give a demonstration'' of how section 288a should be violated, which announcement was followed by general laughter and applause. Later on an announcement was made that all present were invited to return on the night of the 13th and that a party would then be put on which would make the present one seem like a ''teaser''.

During the next few days the officers made preparations to permit of a better observation of what might take place within the cabin on the night of the 13th and arranged for a raid at that time. A cupola was built on the rear slope of the roof of the cabin large enough for two or more persons to conceal themselves within it. This cupola was covered with roofing paper similar to that on the roof of the cabin, and an opening was left on its upper end nearest the ridgepole so that from the ground it would look like a part of the cabin. The cupola was built over four holes or openings which were made in the roof. One of these was a knot hole a couple of inches in diameter and the other three were slots made by widening cracks between boards in the roof, the slots being from three to five inches long. There is ample evidence that these slots or openings afforded a view of every room in the house and of nearly all parts of these rooms.

On the evening of March 13th, four deputies from the sheriff's office and two officers of the military police at March Field went to this cabin and concealed themselves. Two occupied the cupola on the roof, two were in the drainage ditch to the rear and northerly from the cabin, and two were in some trees about ninety feet easterly from the cabin. About an hour later one car appeared, a little later two other cars, and eventually all seventeen of the defendants were in the cabin. What there occurred was observed by the two officers in the cupola and some portions were seen or heard by the officers concealed outside Their evidence is also confirmed in many particulars by the testimony of two of the defendants who pleaded guilty. Shortly after the party started an obscene picture was hooted on the wall and

obscene remarks were made concerning it. Liquor was served and there is ample evidence of these men kissing and caressing each other, of various ones dancing together in what may be summarized as a highly improper manner, and of other acts which need not be referred to which are highly suggestive as to the nature of the party. About 1 o'clock A. M. the officers appeared openly and arrested all the participants except Bill Doe who had previously left.

The two officers who were stationed on the roof testified in detail as to what occurred on several distinct occasions during this evening, on each of which some two of the defendants went off by themselves in one or the other of the two bedrooms, and on one occasion the bathroom. The acts testified to by them as having been performed on these respective occasions fully and completely disclose, in each of these instances, a violation of section 288a. There can be no question that ample direct evidence appears in the record to support the conviction of the respective appellants charged with this offense in counts III to XI, inclusive.

In this connection we may refer to certain contentions made by the appellants to the effect that some of the evidence, just referred to, is unworthy of belief and that some was improperly received. The appellants argue from one statement made by the man who built the cupola on the roof that it was enclosed on all sides, with no opening, that this conclusively proves that these officers could not have been concealed therein, and that the entire evidence as to what they saw must be disregarded. This argument is one for the jury at best, and it is easy to see why the jury refused to accept the suggestion that a cupola built for this express purpose would be so constructed that it could not be used. There is ample evidence that it was built with an opening at its upper end and that it was actually used on this occasion for the purpose for which it was intended. Three photographs were introduced in evidence showing a rear view of this cabin with the cupola upon the roof. One of these shows the box-like construction of the cupola without any roofing paper over it. In that picture appears a vine at the rear of the cabin the top of which reaches the lower edge of the roof just below the cupola. In another, the cupola is shown covered with roofing paper and the vine appears to be bent over toward the ground so that its middle or

highest part extends only about half way up to the eaves. In the third picture the cupola is also covered with roofing paper but no vine appears. It is argued that this indicates that these pictures were taken at great intervals of time extending over what must have been the period necessary for this vine to grow up to the eaves, and demonstrates that this cupola was not constructed a few days before March 13th, as testified to by several witnesses. No more than a conflict appears in any event, and it may be observed that the only conclusion reasonably to be drawn is that the vine extended to the eaves while the cupola was being constructed, that when the second picture was taken the vine had fallen or had been knocked half way down, and that when the third picture was taken it had been cut down. It is argued that no sufficient foundation was laid for the introduction of these pictures, and that it does not appear exactly when they were taken. While these pictures satisfy a natural curiosity as to what this cupola looked like they serve no other purpose, they are in no way essential to the People's case and whether or not a sufficient foundation for their admission was laid no possible prejudice is shown.

■ It is further argued that if there were any holes or slots in this roof on this occasion a person looking through them could only see directly downward, that his view would be obstructed by a small shelf in the hallway and by the portion of a ceiling which covered a part of the living room and extended about a foot over one of the bedrooms, and that it conclusively follows that these officers could not have seen what they said they saw. This argument is contradicted both by common experience and by the record in this case. A hole, some two inches wide and three to five inches long, between two boards on a roof a considerable distance above such partitions as these would afford a vision over a considerable space and the same would not be confined to what was immediately below the aperture. Again, this argument was one for the jury and the view they took of it finds complete support in the record. Several other photographs depicting this cabin, its immediate surroundings and portions of its interior were admitted in evidence and the appellants contend that no sufficient foundation for their admission was laid. While these pictures show the general situation in and around this cabin they are not essential, and the only ones which

have much or any value are those showing the interior of the cabin, which were taken that night following the raid and for which a sufficient foundation was laid. Because it could not affect the result we refrain from going into the matter as to whether the admission of any of these pictures was improper.

It is further contended that the two defendants who pleaded guilty were accomplices, and that their testimony must be corroborated by other independent evidence which, in itself, is sufficient to satisfy the minds of the jurors beyond a reasonable doubt of the guilt of the accused. Not only is this statement of the law entirely erroneous (*People* v. *Negra,* 208 Cal. 64 [280 Pac. 354]), but the testimony of these accomplices finds full corroboration in the testimony of the officers even under such a rule.

We will now consider the sufficiency of the evidence relating to counts XII, XIII and XIV. In count XII appellants Bailey and Kirkland were charged with a violation of section 288a, which is claimed to have taken place during this same evening in an automobile parked near this cabin. In counts XIII and XIV appellants Bailey and Mitchell are charged with two other violations of this section which it is claimed took place in this same automobile. With respect to count XII an officer testified that before the raid took place he saw Bailey and Kirkland leave the house and enter this automobile, and that at the time of the raid he instructed another officer to go to this car and get the two men who were in it. There is testimony that two of the officers then went to this car and found Bailey and Kirkland sitting in the front seat; that Bailey was leaning over against Kirkland with his arms around him; that one officer told Bailey to get out and when he refused pulled him out; that Kirkland got out on the other side of the car and after fastening his trousers started to walk away but stopped when told to do so; and that both men were then brought into the cabin where the other defendants were. With respect to counts XIII and XIV there is evidence that during the evening and before the raid, Mitchell and Bailey got into the back seat of this automobile, which was parked some seventy-five feet from where two of the officers were hidden. One of these officers testified that he could see the car, that they got into the back seat and that they later got out of the car and went back into the cabin. The other officer testified that he saw these two men

come out of the house and get into the car; that he could see their heads bob around occasionally; that when someone opened the door of the cabin the light flashed out and he could see movements in the car, but that he "could not tell what was doing there"; and that he saw these men get out of the car, light cigarettes, hold a short conversation and then go back into the cabin. While the actions of these three persons furnish a natural ground for suspicion in view of the nature of this party and of many other things which occurred in and around this cabin during this evening, the evidence is not sufficient, in our opinion, to sustain a conviction upon these three counts.

Count XV charges two of the appellants with a violation of section 286 of the Penal Code, which is claimed to have taken place during this evening in an outhouse a short distance easterly from the cabin. Some of the evidence heretofore referred to has an application in connection with this count in disclosing the general situation. It appears from the testimony that the officers carefully examined this toilet just before this party began and again immediately after the raid. It also appears from the testimony of these officers that while this party was in progress these two appellants left the cabin and entered the toilet where they remained about fifteen minutes, after which they returned to the cabin. When the toilet was examined after the raid it was found that it had not been used for the purpose for which it was intended and a handkerchief was found on the seat. This handerke.. iof and certain clothing worn by these two appellants at the time were examined by a chemist, whose testimony appears in the record. Without setting forth his testimony here we will say that, in our opinion, the evidence relating to this count fully sustains and justifies the conclusion reached by the jury.

Count I charges all of the defendants with a conspiracy to violate section 288a of the Penal Code and alleges certain overt acts, some of which at least were established. In *People v. Lee*, 23 Cal. App. (2d) 168 [72 Pac. (2d) 572], it is said: "In order to constitute conspiracy it was not necessary that the defendants enter into an elaborate and detailed agreement prior to the commission of any overt act. It is only necessary that each has adopted a common design with the knowledge and consent of the other to constitute them conspirators." The law fixes no time at which a con-

spiracy must have been entered into, it is not necessary that there should be a formal agreement or one expressed in words, and if at any time or in any manner the conspirators tacitly come to a mutual understanding to commit a crime this is sufficient to constitute the conspiracy and it is not necessary for the prosecution to show that the criminal enterprise in its inception had in contemplation a particular crime as against a particular person or as between particular persons. (*People* v. *Yeager,* 194 Cal. 452 [229 Pac. 40].) In a conspiracy the acts of one are considered the acts of all.

We have here the testimony of a number of witnesses as to conversation and acts of many of these defendants at this same cabin on the night of March 6th, as to conversations of various defendants during the ensuing week, and as to many acts at the same cabin on the night of March 13th. An invitation was extended to all present at the first party to come back on the 13th and bring their friends. At least two witnesses testified that they fully understood that they were to bring only people who were "queer" or "who knew the score", the meaning of which expressions clearly appears from the evidence. While the appellants argue that the party was given by the defendant Bill Doe, who was not apprehended, that he furnished the refreshments and that, therefore, it was not a common undertaking, we think it sufficiently appears from the evidence as a whole that everyone who was present on March 13th knew what kind of a party it was and came for a particular purpose. It cannot be reasonably inferred that any of those present would have remained longer than a few minutes if he had not understood or had been deceived in the nature of the enterprise. The congregating of these men in this isolated cabin and the lewd and lascivious acts, which followed immediately after their arrival there, indicate a previously conceived scheme or plan and justifies the inference which was apparently drawn by the jury that each and all of these parties were acting in accordance with a common design and purpose, which was known to and consented to by each of the others. A remark made by one of the appellants at the time of the raid is significant. Four of the officers entered the cabin first, leaving the others outside. When they entered this appellant said: "They haven't got anything on us —remember, fellows, there is only four of them and there is sixteen of us. Stick together, don't say anything." While

the proof of a conspiracy in this instance must, as is usually the case, rest at least in part upon circumstantial evidence, we think the evidence is sufficient to justify the verdict as to this count and that such part of the evidence as is circumstantial is entirely inconsistent with the idea of innocence on the part of any of those participating in this party.

A somewhat different situation appears with respect to count II which charges all of the defendants with entering into a conspiracy to violate section 286 of the Penal Code. The only evidence of a specific violation of this section on this occasion is that respecting the acts of two of the defendants relating to count XV. In that instance any such act was committed by these two who had temporarily left the rest of the party. Aside from these two, we find no evidence in the record which would support the conclusion or the inference that any of the defendants violated section 286, intended or planned to do so, knew that others were committing that crime or in any way aided or participated in the commission of that crime by others. In our opinion, the evidence is not sufficient to support the verdict and judgment in so far as the same is based upon count II of the indictment.

Certain assignments of error in connection with the admission or rejection of other portions of the evidence will next be considered. Testimony was received of certain statements made a few days after the raid by two of the defendants who did not appeal. It is argued this was prejudicial to the appellants. No error appears as the court before permitting this evidence, and again in its final instructions, plainly told the jury that any such statements were to be considered only as against the persons making them.

It is claimed that the court erred in permitting evidence to the effect that one of these appellants had been guilty of a violation of section 288a at times prior to those involved in this action. It is argued that evidence was thus received of other and distinct crimes, which constitutes reversible error under the rule laid down in such cases as *People v. Wyett,* 49 Cal. App. 289 [193 Pac. 153]. It was held in that case that an error of this nature was sufficiently prejudicial to compel a reversal regardless of section 4½ of article VI of the Constitution. The court pointed out, however, that the defendant was convicted upon the testimony of the prosecuting witness alone and that his evidence was in some re-

spects quite uncertain and must have been strongly supported in the minds of the jury by the evidence of other similar acts committed by the defendant. In the case before us it cannot be assumed that the admission of this testimony affected any of the appellants other than the one referred to in that evidence, as the court instructed the jury that if they considered the evidence at all they must consider it only in connection with his guilt. This evidence was offered in rebuttal for the purpose of impeaching a general statement to the contrary made by this appellant. In a way, counsel for the appellants opened the door for this evidence although it may be said that the impeachment was upon a matter which was largely immaterial in this action. Although we think the court should not have admitted this evidence, in view of the amount and nature of the other evidence which here appears it cannot be assumed that the same could have carried such weight with the jury as to influence their verdict. While the admission of such evidence may be sufficiently prejudicial to justify a reversal in a close case it would be contrary to both the letter and spirit of section 4½ of article VI of the Constitution to give it that effect in such a case as this, particularly where appellants' counsel is not free from blame.

One of the defendants, who pleaded guilty and who testified in this case, was asked on cross-examination if he had not applied for probation. An objection to the question was sustained. It is argued that this was a proper impeaching question which went to the state of mind or possible bias of the witness, and that it could be shown, outside the record, that this witness applied for probation, that the hearing thereon was continued several times, and that his case was transferred to the juvenile court after the appellants were convicted. The court should have permitted the full facts in this regard to be given the jury under the rule laid down in *People* v. *Pantages,* 212 Cal. 237 [297 Pac. 890], but we cannot here consider this error sufficiently prejudicial to justify a reversal. While the rejected evidence was such as might well affect the credibility of this witness it is hardly reasonable to say that the jury might have refused to believe him when his testimony was so thoroughly supported by that of the two officers who were in a position to see what occurred. In any event, his testimony was not essential to the prosecution's case and if it be assumed that the jury

might otherwise have regarded him as unworthy of belief it cannot be assumed that this would have had any great bearing on the result.

■ Error is assigned in the admission of another block of evidence, which is referred to in the briefs as exhibits 23 to 87, inclusive. These are pictures and cards found in the locker of one of the appellants at March Field on the day after the raid. A large number of these exhibits are cards and papers which are entirely immaterial. Among these exhibits are five small pamphlets, each consisting of some half dozen pages, and each pamphlet constituting a series of obscene pictures. There are several duplicate copies of each of these pamphlets and several loose leaves which are duplicates of some of the pages from the various pamphlets. We can see no theory under which these exhibits were admissible and, in our opinion, their admission was plainly erroneous. Assuming that such error would be prejudicial in a close case depending upon unsatisfactory evidence, a somewhat different situation here prevails. This trial lasted many days and not only was the evidence of guilt, with the exception of certain counts as above pointed out, satisfactory and strong but the direct evidence was of such a nature that it is impossible to believe that the jurors could have been influenced by these pictures to do something they would not otherwise have done. Regardless of the fact that several errors in the admission and rejection of evidence thus appear it cannot be said under these circumstances that they are sufficient to justify a reversal, and we are far from convinced that any or all of them have led to a miscarriage of justice.

■ Some contention is made that the court erred in overruling a demurrer to the indictment. It is argued that counts I and II, the conspiracy counts, are insufficient since one or more of the overt acts alleged were nothing more than misdemeanors, that therefore these counts do not charge the defendants with the commission of felonies, and that none of the other counts charges a felony because each alleges that it is a separate count "being an offense of the same class of crimes committed at the same time and place". We must confess our inability to follow the argument made. Counts I and II charge a conspiracy to violate sections 286 and 288a, respectively. Each of those sections provides for a punishment which brings the crime into the felony class. Counts

III to XV, inclusive, charge respective violations of these sections of the Penal Code substantially in the language of the code with a definite and certain statement as to the parties involved, and the time, place, mode and manner of the commission of the offense. One argument in this connection is at least novel. It is argued that section 288a of the Penal Code, properly construed, does not make any act claimed to have been committed by any of these defendants a crime. It is said that this section provides that any person "participating" in the act referred to in the section is punishable by imprisonment, that the plain meaning of the word "participating" is "assisting", and that it follows that the statute does not make it a crime for two persons to perform the act mentioned in the section, but only makes it a crime for a third person to assist them. Aside from its novelty this argument has no merit and the mere statement thereof should be a sufficient answer. The demurrer was properly overruled.

The appellants attack a large number of the instructions given. It would prolong this opinion to an unreasonable extent and serve no useful purpose to set forth and consider the respective claims of error made in this connection. In many instances the statement is made that some portion of an instruction is erroneous without any attempt to support the claim by argument or authority. In most of these attacks some clause or sentence from an instruction is taken independently and a meaning given thereto which could not possibly be attributed to it when considered with the context and in connection with the rest of the instructions. In the same way it is argued that several conflicts appear between various instructions, although a different result obtains if these instructions are considered as a whole. We have carefully gone over all of these instructions and find no prejudicial error. Not only must a reviewing court consider all of the instructions as a whole but in this case the jury was specifically told that the court had not intended to give them all of the law in any one instruction, that they were not to single out any one instruction and base their verdict thereon, but that they must consider and construe each instruction with all of the others. ▮▮▮ Only one assignment of error in connection with the instructions given requires consideration. The court gave an instruction to the effect that drunkenness

is no excuse for the commission of a crime. Appellants point out that this instruction omits that part of section 22 of the Penal Code which provides that where a specific intent is a necessary element of a particular crime the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the intent with which he committed the act. *People* v. *Siegel,* 2 Cal. App. (2d) 620 [38 Pac. (2d) 450], is cited and it is argued under that authority that the instruction here in question failed to advise the jury that if it believed that any particular defendant was in such a degree of intoxication as not to be able to give his consent at the time any of these acts were performed a verdict of not guilty should be returned as to him. Conceding that the instruction in question is incomplete in this respect it may be first observed that the omitted rule could have applied only with respect to the first two counts of the indictment. Not only is there no evidence of intoxication on the part of any of the defendants up to the time that any crimes which were committed were completed but the only evidence of intoxication on the part of any one of them at any time is that at the time of the raid, somewhere around 1 o'clock A. M., the defendant Gee was found asleep in a bed and in such a state of intoxication that he had to be assisted to a car. Not only is there no evidence as to when he reached such a degree of intoxication as not to have been able to give his consent to any particular act, but he pleaded guilty and is not involved in this appeal.

Complaint is also made of the refusal of the trial court to give some forty-seven instructions offered by the appellants. Not only do many of these, as admitted by appellants, contain erroneous matter, but in so far as they are correct statements of the law, the substance thereof was adequately covered in the instructions given.

Error is assigned in the refusal of the court to grant two motions for a separate trial, it having been requested at one time that one trial be had as to the first two counts, another trial as to counts III to XIV and a third trial as to count XV, and at another time that there be one trial as to counts I and II and another trial as to the remaining counts. The only argument advanced is that the seventeen defendants represented various grades or strata of society, that on this account it is probable that "all of the appealing defendants

were dragged down the stream of repulsiveness and engulfed in the whirlpool of guilt'', and that it was unfair to try them together. The reason given furnishes no legal grounds for a severance. The offenses charged in counts III to XV took place on the same evening, at the same place, within a short period of time, and by members of one group. Counts I and II, while involving also things which took place shortly before the evening just mentioned, were largely concerned and intimately connected with the events involved in the other counts. All of the offenses were of the same general class and involved largely the same evidence, and it could well be said that it was in the interest of justice that all of the charges be tried together. The matter was one within the discretion of the court and nothing appears to show that this discretion was abused. (Sec. 1098, Pen. Code; *People* v. *Dowell*, 204 Cal. 109 [266 Pac. 807]; *People* v. *Perry*, 195 Cal. 623 [234 Pac. 890].)

It is contended that the court erred in failing to admonish the jury, as required by section 1122 of the Penal Code, at some of the recesses and adjournments. This trial lasted many days and there were fifty-nine recesses or adjournments. While the record does not show a failure to admonish the jury on any of these occasions it fails to affirmatively show that the jury was so admonished on the twenty-first adjournment, which was for a noon recess, and on the twenty-seventh which was for a short recess during the day. In all other cases the record shows affirmatively that the jury was admonished although in some of these cases the transcript merely states that the jury was duly admonished by the court. We cannot presume error and there is no attempt to show any prejudice resulting from the instances in which the record is silent. If it be assumed that there was any irregularity in this respect it is not sufficient to justify a reversal. (*People* v. *Olds*, 86 Cal. App. 130 [260 Pac. 321]; *People* v. *Leavitt*, 100 Cal. App. 93 [279 Pac. 1056].)

A few words from some remarks made by the trial court to the jury after the case had been submitted are assigned as error, which is stated to be "one of the most important alleged errors committed by the trial court". In answering a question asked by the foreman of the jury the court used the words "and also as to certain statements alleged to have been made by certain defendants *following the*

*completion of the conspiracy"*. (Italics ours.)   It is argued that the last six of the quoted words told the jury that a conspiracy had been completed, and that the court thereby invaded the province of the jury.   While it would have been better to have referred to the *alleged* completion of the *alleged* conspiracy it is not reasonable to think that the jury could have misconstrued the language used and taken it to be an expression of opinion on the part of the court that it had been established, as a fact, that a conspiracy existed.   The court had instructed the jury that they were the exclusive judges of the weight of the evidence and the credibility of the witnesses, that the court did not intend to express or intimate any opinion as to what facts were or were not established, and that if any expression of the court seemed to indicate any such opinion the same was to be disregarded.   A further consideration is that no objection or exception was made or taken at the time, when the matter could easily have been corrected.

▉   The last point which will be considered is that the district attorney was guilty of prejudicial misconduct in certain remarks made during his argument to the jury.   Five instances are set forth in which some one of the defendants was referred to as a "pervert".   Aside from any other consideration the appellants admit that they did not assign the use of this word in these instances as error, and the matter need not be further discussed.   During a portion of his argument the district attorney stated "I think any other verdict other than guilty upon all of the counts in this indictment would be an insult to your intelligence and to mine and would cast reflection upon the honor and dignity of this court."   Thereupon, counsel for appellants stated "I wish to assign the remark of the district attorney that a verdict of not guilty would be an insult to the dignity of this court as error prejudicial to the substantial rights of the defendants, and I ask the court at this time to specifically instruct the jury to ignore the same, and instruct them upon that."   Thereupon the court said: "The jury have already been instructed as to statements of counsel in the course of a criminal trial." The appellants cite *People* v. *Pantages, supra,* as authority for the proposition that the making of the remark in question constitutes reversible error.   We think the case referred to is, in itself, sufficient authority for a contrary holding.

While minor errors appear in this record, the appellants had a fair trial, and, except as noted with respect to certain counts, the evidence amply supports the verdict and judgment, any errors which appear are not sufficiently prejudicial to warrant a reversal, and no miscarriage of justice is disclosed by the record.

That portion of the judgment which is based upon counts II, XII, XIII and XIV of the indictment is reversed. In all other respects and as based upon all other counts the judgment and order appealed from are affirmed.

Marks, J., and Jennings, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 10, 1938.