[Crim. No. 2522.   First Dist., Div. Two.   Feb. 25, 1949.]

THE PEOPLE, Respondent, v. ALTA ANDERSON et al.,
Appellants.

Albert A. Spiegel for Appellants.

Fred N. Howser, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

GOODELL, J.—By an indictment in four counts the defendants Anderson, Rodley and Jenkins were accused of conspiracy (Pen. Code, § 182) to commit abortions, and of committing abortions (Pen. Code, § 274), on three women, C. T., L. L. and G. D. It alleged that the offenses were committed in the city and county of San Francisco and the county of San Mateo. The three defendants were tried together and verdicts of guilty were returned on each count. They were sentenced to Tehachapi, with the four sentences running concurrently. A motion for new trial was denied and an appeal taken by each defendant. The Anderson and Rodley appeals were dismissed by them but this appeal was carried forward by defendant Jenkins.

That abortions were performed on each of the three women on January 2, 1947, at the same place in Colma, San Mateo County, was proved by direct evidence which was uncontradicted. None of the defendants took the stand and no witness was called in their behalf. The principal question on this appeal is with respect to the connection of appellant with the conspiracy and with the abortions.

The record shows without dispute that defendant Anderson and her daughter, defendant Rodley, occupied a dwelling at 1097 South Van Ness Avenue, in San Francisco; that on December 27, 1946, C. T. called there by appointment, and on December 30, L. L. and G. D. called there, separately, by appointment. With each woman the procedure was about the same. After waiting in a reception room where other women were waiting they were taken in turn into an operating room where they were given a physical examination to determine whether they were pregnant and if so the approximate stage of pregnancy. Each of the women had become convinced beforehand of her pregnancy and each testified frankly that the purpose of her visit was for an abortion. All three were married. L. L. and G. D. testified that the physical examination was made by defendant Anderson. C. T. testified that she did not know who examined her because of a shade over

her face. Each was charged $5.00 for the examination and was told that the abortion would cost $300. In each instance a definite engagement was made for the performance of the abortion a few days later. For L. L. and G. D. the date was January 2 and each of them was told to be in front of a certain well-known business establishment in Daly City at 1 p. m. on the 2d. An earlier date had been set for C. T., but when she found she could not meet it, she was told to be at 1097 South Van Ness at 11:30 a. m. on January 2d.

On that day at 11:30 a. m. C. T. arrived there and was seen to enter. At 12:45 p. m. she, accompanied by defendants Anderson and Rodley, came out the front door and photographs in evidence show them coming out and getting into a Cadillac sedan. Defendants Anderson and Rodley were in the front and C. T. in the back seat.

At 1 p. m. the Cadillac drove up to the rendezvous in Daly City, where L. L. and G. D. were waiting. Defendant Rodley alighted and the car drove up the street a ways where defendant Rodley reentered the front seat and L. L. and G. D. got into the back seat with C. T. The three in the back seat were told that when they got to a certain spot nearing their destination they should slip down to the floor so as not to be seen by the neighbors, which instructions they obeyed.

At 1:12 p. m. the Cadillac drove up to 201 Garden Lane, in Colma, and into the driveway beside the house, where all five women alighted and entered the house by a side door. Two San Francisco police inspectors watching the place from near by saw this.

Each of the three women paid defendant Rodley $300 just before her operation. Each testified that no anaesthetic was administered, and related the circumstances of her operation. None, however, saw the person who operated, for a curtain suspended from above shut off her view of the operation and the operator. Each of the three testified that while on the operating table she heard whispered conversations. Two of them testified that this whispering was between two, and at times three, women, but none could make out what was said. L. L. identified the voices of defendants Anderson and Rodley. C. T. testified that during her operation defendant Rodley stood beside her, near her head.

After the operation each woman was taken to a place to lie down, two on cots in one room, the other on a Chesterfield in another, and while resting the officers entered.

Thus far appellant Jenkins has not been mentioned. The two inspectors who saw the Cadillac drive up at 1:12, had arrived at about 12:30. At 12:45 they saw a woman drive up alone in an Oldsmobile, open the garage door, drive in, close the door, and then enter 201 Garden Lane by the front door. They could not see whether she unlocked the door but neither could they see anybody open it from inside. This woman was later identified as appellant.

The officers left about 1:30 or 1:45 and returned about 2:30 and resumed their vigil. About 2:45 defendant Rodley came out of the house and drove off; she was intercepted by the officers about a block away and brought back. When questioned she said nobody but her mother was in the house. When asked if appellant was not there also she answered in the negative and said she had not seen her for a month or six weeks. One of the inspectors went to the rear to watch that part of the premises. The other inspector with an assistant district attorney from San Francisco and defendant Rodley were admitted at the front door by defendant Anderson and found the three women resting after their operations. In the house were surgical instruments and equipment (all of which was introduced in evidence) including an operating table, a sterilizer, a spotlight, drugs and medicines, thermometers, gauze, sponges and surgical dressings. The house, while seemingly a dwelling from outside appearances, with two ''for sale'' signs in front, was not furnished for occupancy.

Within a few moments after the officers' entry at the front, appellant Jenkins left the house by a side or rear door and was apprehended in the garage by the inspector on watch at the rear. She was without hat or coat, but had her purse under her arm. She had left her fur coat in the house. When asked her name she gave no answer and when asked what she was doing there she answered that she was visiting the people in the house. When brought back inside she and defendant Anderson were questioned. The report of Inspector Ahern, read into the record, shows the following: ''I then asked her and Gertrude Jenkins who owned the instruments in the operating room, and Gertrude remained mute. I then turned to Alta Anderson and asked her and she stated that she would not say anything so she said she would take the blame fully, as they were all mine.''

On the way back to San Francisco C. T., L. L. and G. D. were taken to the San Francisco Hospital and examined by a physician, who testified that each case showed evidence of

recent instrumentation and that in each case an abortion had been performed.

A stop was made at appellant's home on the way back to San Francisco where certain admissions which are detailed later were made by appellant respecting the possession of surgical instruments belonging to her.

██ Appellant contends that the city and county of San Francisco was not the proper county for the prosecution and trial of this case. Respondent relies on three statutory provisions to fix the jurisdiction and venue in San Francisco.

Section 781, Penal Code, provides that "When a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county."

Section 182 provides that ". . . All cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done."

Section 184 provides that "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done."

While the abortions were performed in San Mateo County, the preliminary arrangements were made at the house on South Van Ness; there the physical examinations were made; there each of the women was told that $300 would be the charge; there three definite engagements were made for the abortions to be performed on January 2d; hence certain steps were taken in San Francisco which were part of the offenses later consummated in Colma.

In addition to those steps, on January 2d at 12:45 p. m., defendants Anderson and Rodley, with C. T., left the South Van Ness house in their Cadillac, destined for the Colma house. They arrived in Daly City—just across the county line—at 1 p. m. For 15 minutes, then, the two defendants were traveling through San Francisco on their way to the place where the abortions were performed, and there was no change of plan or deviation from their original purpose. This stage of the journey through San Francisco was an integral part of the illegal enterprise.

These acts in San Francisco bring the case within sections 182, 184 and 781. Several cases are directly in point. *People*

v. *Duffy,* 110 Cal.App. 631 [294 P. 496] and *People* v. *Anderson,* 3 Cal.App.2d 521 [40 P.2d 270], were robbery cases prosecuted in Sacramento County. The actual holdups, however, were across the river in Yolo County. In each case the illegal journey started in Sacramento and that reason was held sufficient under section 781 to give Sacramento County jurisdiction. In *People* v. *Benenato,* 77 Cal.App.2d 350 [175 P.2d 296] the prosecution was in Sacramento County. That was a pandering case with one count for conspiracy and one for an attempt. The court held the case triable in Sacramento County on both counts, despite the fact that the principal overt act was in Amador County where the appellant maintained a house of prostitution. *People* v. *Anderson,* 3 Cal. App.2d 521, *supra,* cites *People* v. *Grubb,* 24 Cal.App. 604 [141 P. 1051] and *People* v. *De Martini,* 25 Cal.App. 9 [142 P. 898] (pandering cases) and *People* v. *Steffner,* 67 Cal. App. 1 [227 P. 690] (false pretenses) in all of which section 781 was applied.

Other cases where section 781 was applied are cited in *People* v. *Megladdery,* 40 Cal.App.2d 748 at 774-777 [106 P.2d 84]. Still others are *People* v. *Mandell,* 35 Cal.App.2d 368 [95 P.2d 704] ; *People* v. *Megladdery,* 40 Cal.App.2d 643 [105 P.2d 385] and *People* v. *Wallace,* 78 Cal.App.2d 726 [178 P.2d 771].

We are mindful of the fact that this point is raised by appellant, while thus far we have dealt only with jurisdiction and venue in connection with the other defendants. If, however, appellant is connected up with the conspiracy then what has been just said applies with equal force to her as well, for reasons presently to be given.

Appellant frankly concedes that ''because of the difficulty of proving clandestine agreements without such evidence,'' circumstantial evidence is admissible to prove a conspiracy (*People* v. *Gonzales,* 20 Cal.2d 165 [124 P.2d 44] ; 5 Cal.Jur. p. 521), but she claims that here the prosecution had to rely on a pyramiding of inferences in order to connect her with the several offenses. We do not agree that any inference had to be based on any other inference to establish such connection. The undisputed facts show the arrival of appellant at the Colma place just 27 minutes ahead of the other two defendants with the three women. They show her entrance into the house and her departure from it, and without resort to inference they show the commission of three felonies in the house between her arrival and departure. Counsel for

appellant argues "Assuming that the unidentified third person in the room was Mrs. Jenkins, reason can suggest any of a number of innocent reasons why she would or should have been there" but does not suggest what any one of such reasons might be. The place was not a home; nobody was living there. It was equipped with a large variety of surgical instruments and equipment, all laid before the jury as real evidence and supplemented by numerous photographs of the exterior and interior of the house with the instruments and equipment in place from which the jury could see that on the outside it appeared to be a dwelling house up for sale while on the inside it was outfitted as a surgery. The following comment in *People* v. *Jordan,* 24 Cal.App.2d 39, 50 [74 P.2d 519], another conspiracy case, with respect to the presence of a defendant at the scene of the crime applies to this case: "It cannot be reasonably inferred that any of those present would have remained longer than a few minutes if he had not understood or had been deceived in the nature of the enterprise."

The fact that appellant drove right up to the garage door, opened it up, drove in, closed it and then entered the house would warrant the jury in concluding that she was neither a casual visitor, a prospective buyer, nor an intruder, but that she had familiarity with the place and free entry to it. The fact that she arrived just 27 minutes ahead of the other two defendants, who had a definite engagement to commit abortions there was ample basis for the direct inference that appellant was a party to the same engagement.

Appellant argues further that "Certainly, mere presence in a house is insufficient to support a conviction for a crime committed by others in the same house; for then any person found at or near the scene of a crime can be held to be a participant therein. Yet the jury plainly reasoned that 'if she was there, she must be guilty'; for there is no other basis of guilt in this case."

Nobody will question the general proposition that mere presence at the scene of a crime does not necessarily incriminate, but here the direct evidence (without the aid of any inference) shows that three women were in the place within hearing of the women on the operating table, since three women's voices were heard. The presence of defendants Anderson and Rodley was definitely accounted for since they were not only heard but seen in the house. The appellant was seen to enter and leave the place, and from this combination of events, and by the process of elimination, the jury could

draw the direct inference that hers was the third voice heard in the operating room.

Appellant left the Colma house by a rear or side door about the time the officers entered the front door, and she left without a hat or coat, but with her purse under her arm. She had opened the garage door where her Oldsmobile was left when apprehended by the inspector. When asked her name she made no answer. When asked what she was doing there she answered that she was visiting the people in the house and "false statements for the purpose of misleading or warding off suspicion" are indicative of a consciousness of guilt. (*People* v. *Cole,* 141 Cal. 88, 90 [74 P. 547] ; *People* v. *Cooper,* 81 Cal.App.2d 110, 117 [183 P.2d 67] ; 8 Cal.Jur. p. 42.)

The fact that appellant did not stop to put on her fur coat or even pick it up, and the other circumstances of her departure, invite an inference of flight. "Immediate flight, in the absence of any accusation—in advance, perhaps, of the probability of an accusation, formal or informal—may afford persuasive evidence of a consciousness of guilt" (*People* v. *Waller,* 14 Cal.2d 693, 702 [96 P.2d 344], citing *People* v. *Murguia,* 6 Cal.2d 190 [57 P.2d 115], and *People* v. *Erno,* 195 Cal. 272 [232 P. 710] ).

Finally, it may be stated as it was in *People* v. *Waller, supra,* at page 702, that when the prosecution rested its case the defendants offered no evidence, nor did they take the witness stand in their own behalf. As declared by section 13 of article I of the state Constitution, ". . . in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be . . . considered by the court or the jury." See, also, *People* v. *Byers,* 5 Cal.2d 676, 685 [55 P.2d 1177].

The defendants were taken from the Colma house to Redwood City for booking and on the way back to San Francisco Inspectors Ahern and Baroni and Assistant District Attorney Hirshberg stopped with defendants Anderson and Jenkins at the latter's home at 6017 Mission Street where there was a conversation between Inspector Ahern and defendants Anderson and Jenkins. While appellant's home was being searched Inspector Ahern asked appellant where the equipment was or surgical instruments were, that she had. She stated that she had moved them all out to quite some distance away and in the course of the conversation "She then interrupted and said to the defendant Anderson that she may have forgotten

some curettes downstairs in a room in the basement. I [Ahern] asked her for the key to that room, took her and the defendant Anderson downstairs where I met Mr. Hirschberg and Inspector Baroni. I assisted them in making a thorough search of that particular room and after we found no instruments she stated . . . to the defendant Anderson that she must have moved them all.'' Inspector Ahern when shown a report which he had made of this conversation admitted that he had stated therein ''I asked her where she left all her equipment and she said it was a long way off, in San Jose.''

Appellant knew, defendant Anderson knew, and the inspector knew, the kind of surgical instruments, including curettes, about which they were talking and the jury from these admissions could have concluded that they were discussing instruments used in the performance of abortions.

█ Appellant contends that the evidence did not connect her with the conspiracy until January 2d, *after* the overt acts in San Francisco had taken place. In her brief it is said: ''Even if a requisite act did take place in San Francisco, it was completed before Mrs. Jenkins was shown to have participated in the crime and consequently has no force to subject her to the jurisdiction of the San Francisco courts.''

That the appellant arrived at the Colma house at 12:45, which was exactly the time when defendants Anderson and Rodley entered their Cadillac and left the San Francisco house, is established by direct evidence and not left to inference. From those facts the jury could have concluded that any communication had, or engagement made, between defendants Anderson and Rodley and appellant had to be *before* the Cadillac's departure at 12:45. For a quarter hour *after* 12:45 the Cadillac was being driven through San Francisco which was a well defined overt act and an integral part of the illegal enterprise.

''The law fixes no time at which a conspiracy must have been entered into'' and ''It is not necessary that two persons should meet together and enter into an explicit or formal agreement to commit the crime, or that the conspiracy should be expressed in words. If in any manner the conspirators tacitly come to a mutual understanding to commit a crime it is sufficient to constitute a conspiracy.'' (*People* v. *Yeager,* 194 Cal. 452, 484 [229 P. 40], citing 5 Cal.Jur. p. 497.) There was ample evidence from which the jury could conclude that certain of the overt acts in San Francisco took place *after* appellant entered the conspiracy. Indeed it would seem that

the chronology of events just outlined would force the conclusion that there must have been prearrangement before 12:45 p. m. on January 2d.

It is settled law that in a conspiracy, the act of one is the act of all (*People* v. *Creeks,* 170 Cal. 368, 374, 375 [149 P. 821]; *People* v. *Harper,* 25 Cal.2d 862, 871 [156 P.2d 249]). Counsel for appellant concedes "that where a conspiracy has been formed and a third party subsequently joins the conspiracy, such person adopts and ratifies all of the prior acts done pursuant to the original conspiracy" (*People* v. *Mac-Phee,* 26 Cal.App. 218, 224 [146 P. 522]), but it is argued that this is only a rule of evidence and has no application in determining where the prosecution should take place. If "the act of one is the act of all" and the new member adopts and ratifies all prior acts, then an overt act taking place in San Francisco would identify this appellant with San Francisco for purposes of jurisdiction and venue just as much as it would the other two defendants, and we have seen that entering the Cadillac and driving it through San Francisco by the other two could well have been *after* this appellant was a party to the conspiracy. It is to be implied from the verdict that the jury so found.

The evidence was sufficient to support the finding that the appellant was a party to the conspiracy before certain overt acts took place in San Francisco and that she was one of the persons who performed the three abortions.

The judgment of conviction and the order denying appellant's motion for a new trial are affirmed.

Nourse, P. J., and Dooling, J., concurred.