[Crim. No. 1208. Fourth Dist. May 15, 1957.]

THE PEOPLE, Respondent, v. LARRY DRAKE et al., Defendants; SAM DERE et al., Appellants.

Henry E. Bianchi and Rex R. Mull for Appellants.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Kit Nelson, District Attorney (Kern), Bruce F. Bunker and A. C. Paulden, Deputy District Attorneys, for Respondent.

GRIFFIN, J.—On May 4, 1955, appellants Robert Hulsebus and Sam Dere, with certain other defendants, were indicted in indictment Number 7384, on two felony counts under section 182, subdivision 1 of the Penal Code (conspiracy) in conspiring to violate section 11501 of the Health and Safety Code. Count One charged that on December 20, 1954, defendants conspired to violate section 11501, *supra,* by voluntarily inducing and encouraging one Jo Ann Pool, aged 17, to visit or be in a room or place where narcotics were being or had been recently unlawfully used, in violation of section 11556 of the Health and Safety Code. Count Two charged that on December 20, 1954, defendants conspired to violate section 11501, *supra,* by voluntarily inducing and encouraging Jo Ann Pool to use a narcotic, in violation of section 11721 of the Health and Safety Code. Another indictment, Number 7385, charged appellant Hulsebus and defendant Larry Drake with violating section 11501, *supra,* by voluntarily inducing and encouraging her to use a narcotic on December 24, 1954, in violation of section 11721, *supra.* Another indictment, Number 7387, charged appellant Sam Dere and other defendants with the same offense charged in indictment Number 7385, committed on January 22, 1955. Other indictments for conspiracy were filed against certain named defendants other than these appellants.

On May 25, 1955, appellants moved to dismiss the indict-

ments pertaining to them for lack of probable cause as shown by the transcript before the grand jury. These motions were denied. Demurrers to the indictments were overruled. Appellants' motions for separate trials were denied. Pleas of not guilty were entered. The five indictments were consolidated for trial over appellants' objections and 16 defendants were brought to trial on June 27, 1955. The trial consumed two months time and was held in an auditorium due to the number of defendants' attorneys, defendants, the witnesses, and for the convenience of the court. The clerk's and reporter's transcripts exceed 4,000 pages in number. A jury verdict resulted in a conviction of appellant Hulsebus under indictment Number 7385, and appellant Dere under indictment Number 7387, and both on the two counts set forth in indictment Number 7384. Certain other defendants were convicted and others were found not guilty. Appellants were sentenced to state's prison, sentences to run concurrently. Only these two named defendants appealed.

From the voluminous record we will attempt to give a resumé of the salient facts. The prosecutrix, Jo Ann Pool, aged 17 at the time of the offenses charged, was living with her mother and stepfather in Bakersfield. She attended high school. There was an establishment known as "Campus Corner" near there. She and some of the named defendants, with others, patronized this place. She became acquainted with several of appellants' codefendants, particularly defendant Larry Drake, in April, 1954, when she attended meetings of the Progressive Activities Club. She attended public dances and met others, including appellant Hulsebus, a college student living in Bakersfield but attending college in San Francisco. She commenced dating an associate of his (Coke), and with others went to the home of a codefendant of his (McGee) and played music and danced. In July, she and Coke, by prearrangement, met Drake and appellant Hulsebus in Central Park. Later that same evening she returned to the park with Hulsebus and he left her with Drake. They walked to Drake's home and later they, with others, went to the McGee home. There they drank and played music. Jo Ann had never seen marijuana cigarettes until at a later date in Central Park when defendant Drake drove her there. At that time he and one Smith smoked a marijuana cigarette in her presence and called her a "square" for not participating and told her she should "wise up." One Joyce Green appeared on the scene and Jo Ann was told by Smith that Joyce

"smoked pot" (marijuana). Drake, Smith and Jo Ann then went to Drake's home. Smith asked Drake if he "would turn him on," i.e., furnish him with some kind of narcotic. They then returned to the park and the party smoked marijuana cigarettes. Jo Ann did not participate at this time. They "kidded" her about not using it. About two weeks later Jo Ann and appellant Hulsebus, the Drake brothers and others met in another park and Jo Ann, for the first time, saw appellant Hulsebus in the possession of marijuana. They all smoked except Jo Ann. A few days later Jo Ann met Joyce at her home, together with appellant Hulsebus, defendant Drake and others, but Jo Ann saw no marijuana. However, she did see an "outfit" for the injection of heroin, consisting of a spoon, wad of cotton, needle, and an eyedropper. Joyce was seen coming out of the bathroom where she had been with Drake and one other. Jo Ann secured employment at a theatre. Thereafter, she started back to school and frequented the Campus Corner where she again met and associated with many of the named defendants and again began attending public dances, particularly with defendant Drake. In October, she was in a parked car with him and he smoked marijuana in her presence. Two nights later, while in Central Park Jo Ann, for the first time, smoked a marijuana cigarette given to her by defendant Drake. She noticed a "funny sensation in her legs and . . . felt kind of sleepy." Thereafter they joined other defendants to go to another house of "Ocho" to obtain "some more pot." They were unsuccessful. In October Jo Ann was with Drake and Ocho. Ocho went into a service station lavatory and came out and said "he had the stuff," meaning marijuana, heroin or "hard stuff." They drove out into the country and "smoked the pot." During the Thanksgiving vacation, Drake and appellant Hulsebus picked up Jo Ann at the theatre and drove to a house. Either Drake or appellant Hulsebus went in and obtained some marijuana, and the three drove around while smoking these cigarettes. In November, Drake and one other person picked up Jo Ann and drove to a service station where Drake gave her a yellow capsule and said : "You want to get high, don't you?" Jo Ann said "Yes" and the three went to the Drake house. Sometime later appellant Hulsebus came there. Others joined them and they drove away in a car. They all used marijuana. They drove around a while and then went to a motel, engaged a room and Jo Ann went to sleep.

On December 19th Jo Ann again met Drake and appellant Hulsebus at a club. Drake told her "they were going to have

some parties over at Bob's (Hulsebus') house.'' Two nights later Drake and Jo Ann went to Hulsebus' residence. Jo Ann and Drake smoked marijuana on the way over there. Jo Ann said she did not see marijuana used at his home on that occasion, although Drake and appellant Hulsebus appeared to be under its influence. Drake and Hulsebus spent much time together at appellant Hulsebus' home. Drake said he used marijuana with Hulsebus many times. On Christmas eve, Jo Ann and other defendants went to the Hulsebus residence. She used marijuana. She said appellant Hulsebus and Drake came in later and they appeared to be ''high'' and talked about it, but she did not see them use it. They left and on Christmas night she returned with others about 10 p.m. and saw appellant Hulsebus in possession of marijuana. She stated he furnished her with a marijuana cigarette and they smoked it and later she smoked another with them in the bedroom. She stayed until 2 a.m. Two days later she returned and Drake, Hulsebus and others appeared to be under the influence of marijuana. On New Year's eve, about 1 a.m. she went to a club all alone, met Drake and others, and in a car they partook of the same narcotic furnished by Drake. After several of such occasions, Drake told her of his friends, the Virgils, and said that he went over there on occasions and ''had a fix'' (meaning an injection of narcotics). He also told her about Sam Dere, a Chinaman and a café operator (appellant herein) and that he had been going over to his apartment and getting ''fixes of opium.'' Apparently the Virgils had been living with or were associating with appellant Dere about this time. In January, 1955, Jo Ann ate lunch at Dere's café. The Virgils were there. Jo Ann was asked if she would like to go to Los Angeles with them and Drake. She contacted Drake. He then arranged to take her in a car into the country and to give her her first ''fix of hard narcotics.'' They were unsuccessful because the outfit did not work satisfactorily. Thereafter they and others who joined them used marijuana. At the Chinese café Jo Ann and Drake met appellant Dere. Dere told them to wait and he would be back. After some delay they went to Dere's apartment. Appellant Dere gave Jo Ann her first injection of opium. She described in full its appearance, manner of preparation and use, and its effects. Later that evening she returned to that apartment and found the Virgils, appellant Dere and Drake there and they informed her they ''had just got through fixing.'' They appeared to her to be under the influence of a narcotic. On February 9th

Mrs. Virgil took Jo Ann to appellant Dere's apartment, where Mr. and Mrs. Virgil apparently were living at the time. Dere was not there but the Virgils informed Jo Ann that Dere would soon be there and "he was supposed to bring some stuff with him." Later he returned and they all had a "fix" administered by Mrs. Virgil. Similar occurrences took place thereafter and Jo Ann returned to appellant Dere's apartment almost every day and obtained "fixes." The Drakes were also obtaining narcotics from Dere. About this time Jo Ann again saw appellant Hulsebus at the "Campus Corner" and Hulsebus asked her if she had some money "because he could get a good deal, get some pot." She gave him one dollar. After Hulsebus had been to the hospital to see Drake, Jo Ann received a marijuana cigarette from him and he informed her he had found some marijuana and had given some of it to one of his friends. Later Jo Ann visited the McGee residence with some degree of regularity, with others, to use marijuana. This residence was used as a meeting place for those persons desirous of obtaining and/or using narcotics, either marijuana or so-called "hard stuff."

About February 24, 1955, Jo Ann was at the McGee home. The next day Jo Ann failed to attend her school classes and she and another girl went to Los Angeles with several boys to the home of Forrest Prince. Someone there left the home and returned with a statement that they "had connected," meaning they had purchased narcotics. Prince administered an injection to Jo Ann and others "to get high." She said her body felt relaxed, her nose itched, and she was sick to her stomach. They returned home that night and Jo Ann continued her associations at the McGee residence. On one occasion she contributed money for the purchase of some "hard narcotics." On previous occasions it was given to her. She was administered a drug and she saw other guests "papering" (wrapping narcotics) at this residence. Jo Ann was also visiting appellant Dere's apartment and obtaining narcotics for her use. Similar conduct continued. Her school attendance dropped noticeably. About this time a Vivian Penson, one of the group, had some trouble with the police, and Mr. McGee informed everyone he did not want so many people coming to his house. Many met at defendant Jones' home thereafter, including Jo Ann, and received injections of heroin. She still visited appellant Dere at his apartment. Later, Jo Ann and one Rudy went to appellant Dere's apartment, received a "fix," and picked up two marijuana cigar-

ettes belonging to Jo Ann. The next day several boys picked up Jo Ann at school and left for Los Angeles, rented a room and made unsuccessful attempts to obtain narcotics. They later contacted the Virgils at their Los Angeles home, were "fixed" and then returned to Bakersfield. Jo Ann was delivered to appellant Dere's apartment and she remained there until the following Sunday, March 20th. During this period she received several "fixes" by Dere. On March 19th her girl friend, Mary Price, obtained some fresh clothing for her which was furnished by appellant Dere. Later, she left with Drake, both "fixing" with Dere before departing. Dere thereafter furnished her with a mixture of opium which she drank. She and Drake "hitch hiked" to Los Angeles, going to the Virgil residence, where they received more narcotic injections. On the night of March 22nd Jo Ann, Drake and the Virgils borrowed a neighbor's car and were arrested while engaging in attempted burglary for the purpose of obtaining funds with which to obtain narcotics. At the time of the arrest Jo Ann's arms were well marked by hypodermic needles. She later went through the agony of withdrawal from the drug, which was minutely described by her and corroborated by the testimony of a physician. After appellant Dere's arrest he admitted his use of narcotics and his acquaintance with Jo Ann. He did not take the stand to testify at the trial. Appellant Hulsebus denied the charges contained in the indictment and denied knowing some of the other named coconspirators, including Dere. He admitted taking a "puff" on a marijuana cigarette occasionally, but claimed he never entered into any plan or agreement to induce Jo Ann to use narcotics. He claimed he only said "Hello" to her on occasions and that he saw her at the theatre where she worked. Several of these individuals who were with Jo Ann on some of these occasions were granted immunity and testified for the prosecution. Their testimony corroborated, to some extent, the story she related. Hulsebus produced several witnesses to corroborate his story. Others vouched for his good character.

Appellants' argument, in support of their claim that the evidence is insufficient to show a conspiracy involving them, is to the effect that the evidence shows the first time Jo Ann used marijuana in appellants' presence was after she had already started using it; that neither appellant invited her to any place where narcotics were used; that the most that was shown was that she used it and other defendants furnished it; that appellants were not charged with furnishing

it; that there was no evidence showing that either appellant conspired with any person or with one another, since they did not know each other, to induce or encourage her to visit or be in a room or place where narcotics were or had been unlawfully used, or to induce or encourage her to use a narcotic, particularly since she testified on cross-examination that she got no idea from the actions of defendant Drake, appellants Dere or Hulsebus, that she was being induced or encouraged to use narcotics or to go to a place where narcotics were or had been used. She testified she believed the words "induced" or "encouraged" meant trying "to talk you into doing something." It is then argued that appellants were unacquainted with Jo Ann's activities with the other codefendants; that appellants were called upon to defend themselves in a mass public trial with others where public sentiment had been aroused as to the use of narcotics by minors, and appellants were faced with the dangers described in a concurring opinion written by Justice Jackson in *Krulewitch* v. *United States,* 336 U.S. 440 [69 S.Ct. 716, 93 L.Ed. 790]; and *People* v. *Zammora,* 66 Cal.App.2d 166 [152 P.2d 180], relating to mass trials in conspiracy charges and the danger of guilty inferences being drawn from mere association and acts of others. ■ We concur with the expressions there given that every caution should be taken to guard the interests of each defendant in such mass trials, to determine whether there is substantial evidence, standing alone, indicating the defendant's guilt of the offense charged. This subject was discussed by this court in *People* v. *Lyon,* 135 Cal.App.2d 558, 573 [288 P.2d 57]; and *People* v. *Bennett,* 132 Cal.App.2d 569, 576 [282 P.2d 590], where the same claim was made. In *Bompensiero* v. *Superior Court,* 44 Cal.2d 178 [281 P.2d 250], it was held that:

" ' " [i]t was not necessary for the state to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole." ' " (Citing *Lorenson* v. *Superior Court,* 35 Cal.2d 49 [216 P.2d 859].)

The jury, under the evidence produced here, was justified in the belief that each of the transactions here related in-

volved a general conspiracy of inducing and encouraging Jo Ann to use a narcotic in violation of section 11721 of the Health and Safety Code, and to visit or be in a room or place where narcotics were being or had been recently unlawfully smoked or used. Although Jo Ann did testify she was not induced or encouraged to do so, under her interpretation of those terms, the jury had the right to believe that by defendants and appellants' actions and conduct, she was in fact so induced and encouraged, within the meaning of the terms used in the law involved. ■ The word "induce" means "To lead on; to influence; to prevail on; to move by persuasion or influence." ■ The word "encourage" means "To give courage to; to inspire with courage, spirit, or hope; to raise the confidence of; to animate; hearten." (Webster's New International Dictionary, Second Edition Unabridged.) See also *State* ex rel. *Boynton* v. *Wheat Farming Co.*, 137 Kan. 697 [22 P.2d 1093]; *People* v. *Benenato,* 77 Cal.App.2d 350, 355 [175 P.2d 296]. ■ As to appellants not knowing each other and not associating with some of the codefendants, there need be no showing of direct association. (*People* v. *Sherman,* 127 Cal.App.2d 230, 236 [273 P.2d 611].) ■ Common design is the essence of conspiracy, and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to some of them, if their actions are consistently leading to the same unlawful result. (*People* v. *Hess,* 104 Cal.App.2d 642, 674 [234 P.2d 65]; *People* v. *Jordan,* 24 Cal.App.2d 39 [74 P.2d 519]; *Blumenthal* v. *United States,* 332 U.S. 539 [68 S.Ct. 248, 92 L.Ed. 154]; *Anderson* v. *Superior Court,* 78 Cal.App.2d 22, 23 [177 P.2d 315].)

■ Whether appellants were the originators of the conspiracy or later joined and participated in the common design becomes immaterial. This liability continues until the intent to withdraw therefrom is, in some way, brought home to the other conspirators before the commission of the substantive offense or before its purpose is fully accomplished or frustrated. (*People* v. *Jordan,* 24 Cal.App.2d 39, 50 [74 P.2d 519]; 11 Cal.Jur.2d pp. 222-223, § 4; pp. 227 and 228, §§ 8 and 9; and p. 235, § 15.)

It affirmatively appears that before March 24th, 1954, Jo Ann knew nothing about the use of narcotics and had no desire to use them. Drake and appellants did use them, at least to some extent. Through Drake she was invited to certain parties at Hulsebus's home at Christmas time, when his

parents were away and when he returned from college. No doubt marijuana was used by certain members of his invited friends and no doubt he was in fairly close connection with them. This may well have planted the idea in the mind of Jo Ann that it was the thing to do to be popular with that group. The way she learned to use it was by watching the defendants use it and telling her she was a "square" for not using it. The fact that the defendants were all users of marijuana and each knew the others to be users; their frequent "get-togethers" for the purpose of its use; the fact that they furnished this young girl with narcotics and they invited her along on occasions when they used it justified the jury in believing that those regularly present on those occasions were associating for that particular purpose; that they remained and continued to associate for such purpose; and by joining in the activities described they were acting in accordance with a common design and purpose to induce and encourage Jo Ann to use narcotics. (*People* v. *Griffin*, 98 Cal. App.2d 1 [219 P.2d 519]; *People* v. *Jordan*, 24 Cal.App.2d 39 [74 P.2d 519].) As the habit grew, so did the conspiracy. She was furnished not only marijuana by these appellants and coconspirators but she was furnished opium by injection and in a home or apartment where she could clandestinely use it. Others joined in this endeavor and it culminated in the tragic result recorded.

The fact that Hulsebus may have returned to college during a portion of that time did not necessarily relieve him of the results of his original actions and conduct. Each time he returned to Bakersfield the same conduct persisted. (*People* v. *Griffin, supra*; *People* v. *Jordan, supra.*)

Appellant Dere, apparently, with full knowledge of the facts, joined the conspiracy and not only furnished Jo Ann with marijuana but taught her in the use of opium. His apartment was a haven for her when the officers were seeking her. It therefore follows that if Drake, Hulsebus and the other original conspirators took in new members of the original conspiracy, Hulsebus and Dere were liable for any crimes committed by them while he was still a member of the conspiracy and so long as the crime committed was pursuant to the original conspiracy. The element of common design being present, it makes no difference whether they acted separately or together or by different means. If their acts consistently and constantly led to the same unlawful result they were conspirators. (*People* v. *Hess*, 104 Cal.App.2d 642,

671 [234 P.2d 65]; *Anderson* v. *Superior Court, supra.*) This is true even though there be no direct association between all conspirators, since they all had knowledge of the unlawful enterprise and cooperated in it. (*People* v. *Sherman, supra.*) Jo Ann was being shuttled back and forth between the Dere residence and the McGee residence by the various conspirators. ▮ There can be no question but that the actions of the various conspirators created the desire in this young girl to use narcotics; that they made narcotics available to her without cost; that they taught her how to use narcotics; that they made places available to her where she knew she could obtain narcotics without cost, and where she could use them in comparative safety. They made the necessary outfit available to her and were the ones who actually injected the narcotics into her young body. They surrounded her with a way of life and habitat directed to no use other than the use of narcotics and the perpetuation of the habit. The evidence, although conflicting in certain respects, supports the verdict on the counts on which appellants suffered convictions.

▮ Next, it is claimed the court erred in denying a motion for new trial based on the claim of separation of the jury after retiring to deliberate. On a hearing of this motion appellants' counsel orally claimed that in talking to one of the jurors after the trial, the "bulk of the jurors came in at the appropriate time" but one woman juror was "32 to 45 minutes late." It does not affirmatively appear where the jurors were or had been. It was indicated by the prosecutor that the jurors stayed in separate hotel rooms for the night and were to assemble in the jury room before entering upon their deliberations after being transported to the courtroom by bus. The one juror was ill and could not ride in the bus so she was brought to the jury room in an automobile. At the hearing the judge remarked that the jurors had been separated all night and that he did not believe they had assembled for deliberation of the case before the juror arrived; and that the statement of counsel was only a surmise on his part. No affidavits were presented in support of appellants' claim nor in denial of it. No sufficient showing was made of any separation of the jurors after retiring for deliberation such as would indicate any prejudice to appellants. (*People* v. *Martin,* 87 Cal.App.2d 581 [197 P.2d 379]; *People* v. *Truesdell,* 124 Cal.App. 360 [12 P.2d 476]; *People* v. *Knight,* 63 Cal.App. 63, 68 [218 P. 79]; *People* v. *Tucker,* 117 Cal. 229. 230 [49 P. 134].)

■ The court instructed the jury that Jo Ann was, as a matter of law, not an accomplice. As we view it, appellants claim that since the evidence shows that Jo Ann might have been guilty of or chargable with a conspiracy in encouraging and inducing two of the prosecuting witnesses, Mary Price and Adele Williams, to do the acts charged and of contributing to their delinquency, she was an accomplice as a matter of law, or, at least, that question should have been left to the jury under proper instructions. Considering the nature of the charges against appellants, the definiteness of time, overt acts charged, and name of the minor victim, it does not appear from the evidence that Jo Ann, the minor and the victim, could have been guilty of encouraging herself or conspiring with others to do the acts prohibited by the Health and Safety Code section involved, or that she could have been charged with the claimed included offense of contributing to her own delinquency. Any claimed act of Jo Ann, the minor, involving these named minors, would be a separate and distinct charge against different victims. (*People* v. *Lucas*, 16 Cal.2d 178, 180 [105 P.2d 102, 130 A.L.R. 1485] ; *People* v. *Deibert*, 117 Cal.App.2d 410, 427 [256 P.2d 355] ; *People* v. *Stanley*, 78 Cal. App.2d 358, 361 [177 P.2d 968] ; *People* v. *Buffum*, 40 Cal.2d 709, 720 [256 P.2d 317] ; *People* v. *De Paula*, 43 Cal.2d 643, 647 [276 P.2d 600].)

■ Appellants offered an instruction to the effect that Jo Ann, Adele Williams and other named prosecuting witnesses, were accomplices as a matter of law. The court modified the instruction by striking Jo Ann's name and adding thereafter ''and no others.'' Appellants claim that by inserting the words ''and no others'' the court erroneously excluded one of the many witnesses testifying for the prosecution, i.e., Mary Price, claiming her testimony showed she could have been a coconspirator to the offenses charged, or the claimed included offense. As above noted, there was testimony of this witness indicating she saw Jo Ann and Drake use marijuana; that she attended parties at Hulsebus' home but saw no narcotics while there; that she drove her to appellant Dere's apartment and later took her some clothes on another occasion. This witness was not named in the proffered instruction. Considering the number of witnesses testifying, it is understandable how the exclusionary clause may have omitted her name. Under the evidence it might have been well to have submitted the question of her being an accomplice to the jury. However, this was but one of many witnesses

who testified, and it was only as to a few details respecting the entire subject matter. These details were either admitted or sufficiently corroborated by other competent evidence. No prejudicial error resulted. (*People* v. *Davis*, 43 Cal.2d 661, 674 [276 P.2d 801]; *People* v. *Wayne*, 41 Cal.2d 814, 826 [264 P.2d 547].)

 Appellants next complain because the judge read section 11714 of the Health and Safety Code and said this section applied to indictment Number 7386. It is argued that the jurors may not have remembered the number of this indictment and believed it applied to the charges here under consideration. There is no merit to this argument. Evidently charts were before the jury containing the number of the various indictments, the nature of the charges, and the defendants involved. Appellants also used such references in their proffered instructions.

 Prejudicial misconduct of the court is claimed in allowing the police matron in charge of the prosecuting witness to remain in the court room during Jo Ann's testimony. Counsel for appellants assert the matron signaled to the witness when she was on the witness stand. It was intimated by the prosecutor that it was for the purpose of ascertaining if the witness desired a drink of water. No other facts are shown. Counsel for defendants requested the matron be removed from the room. The request was denied. Later, another matron was substituted. No prejudicial error appears. (*People* v. *Ong Git*, 23 Cal.App. 148, 151 [137 P. 283].)

 The court received certain testimony in reference to the alleged conspiracy, over objection and subject to a motion to strike if no conspiracy was shown, or if the conversation occurred after the termination of the conspiracy. Apparently the testimony involved evidence as to some of the actions of Jo Ann after she was arrested. The court, under proper instructions, left it to the jury to determine the scope and duration of the claimed conspiracy. No prejudicial error resulted. (*People* v. *Sica*, 112 Cal.App.2d 574 [247 P.2d 72].)

 Complaint is made in reference to the admission of certain claimed hearsay evidence respecting conversations between Jo Ann and one Charles Smith, who was neither a defendant nor a witness at the trial, and also with May Virgil, a named defendant, but who was not on trial. As to Smith's statement, it was made in the presence of Drake and was admissible against him. Such evidence was, by stipulation, admitted against this particular defendant only, until the jury

found that the conspiracy had been formed. As to Mrs. Virgil, she was alleged to be a coconspirator, and the evidence so indicated. All defendants were bound by her statement, after proof of the conspiracy, including those who were members at the time and had not withdrawn as well as those who joined the conspiracy later. (*People* v. *Cook*, 10 Cal.App.2d 54 [51 P.2d 169] ; *People* v. *Jones*, 25 Cal.App.2d 517 [77 P.2d 897].) The jury was fully instructed on this subject. No error resulted.

Another claim made is that at the trial Jo Ann was an incompetent witness to testify as to whether the cigarettes she saw handled by the various individuals and those which were smoked by her contained marijuana. At the outset of her career this probably was true, but from the reactions described and her prolonged familiarity with it thereafter she was, no doubt, adequately qualified, at the time of the trial, to so testify. Her testimony had corroboration of medical experts. (*People* v. *Candalaria*, 121 Cal.App.2d 686, 690 [264 P.2d 71] ; *People* v. *Winston*, 46 Cal.2d 151, 156 [293 P.2d 40].)

Appellants argue that the direct examination of appellant Hulsebus was unduly curtailed by the court in not allowing him to testify as to the musical instruments he played at college and other activities he engaged in while a student there. He claimed these facts would explain his association with his coconspirators, due to their mutual musical interests. He did testify to these facts in general at a later time. He was allowed every opportunity to develop the claimed basis of his association with his coconspirators. When a witness testifies at a later time to an excluded matter, the error, if any, is cured. (*Pecarovich* v. *Becker*, 113 Cal.App.2d 309, 314 [248 P.2d 123].)

Objection is made to the court allowing a recording of codefendant Caife's statement, or admissions made by him of his knowledge of the coconspirators' actions, to be played to the jury. It contained statements that defendant Caife knew Dere was "dealing," but he did not know Dere. The court admonished the jury at the time that it could not apply to those defendants not present at the time the statement was made, and it was admitted only as to those present. Appellants were not present. It must be presumed that the jury heeded this admonition. (*People* v. *Tarantino*, 45 Cal.2d 590, 597 [290 P.2d 505].)

Apparently one Charles Drake, brother of defendant

Larry Drake, was granted immunity and testified for the prosecution. As such witness, he testified he never saw Hulsebus or certain named defendants use narcotics, never obtained narcotics from Dere, and never saw Dere administer narcotics to anyone; that he was alone in the bathroom of Hulsebus' home when he, Drake, smoked marijuana; that as to certain other defendants he used narcotics with them or saw them use it; that he had used it for four years and was a "pusher" (seller) of marijuana and had used both heroin and opium for two years; that Jo Ann and others were at the park in 1954; that he furnished them marijuana; and that he used it but it was too dark to see if anyone else used it. He also involved the Virgils and appellant Dere. As to Hulsebus, he said he was his school chum; that he was with him every day during the Christmas week in 1954; that he took marijuana there and used it, but he did not remember if anyone else used it because he was only there in body and not in mind; that he had used narcotics in the presence of appellant Hulsebus and others but he had never seen them use it. He was then asked by the prosecutor if he had ever made any statement to the contrary and he denied that he had. Thereafter, the prosecutor claimed the witness had told the officers a different story, that he was surprised at his present testimony, and asked permission to lay the foundation, by tape recording, to impeach the witness and refresh his memory. Over objection the court allowed certain portions of the recording to be played, with a full admonition that the statement was not being presented to the jury to prove the truth of the matters contained therein, but because of its claimed impeaching effect on the present testimony of the witness, and it did not go beyond that. Many inconsistent statements were noted and the court inquired whether the jurors all heard the recording. Many claimed they did not understand all of it. The court ordered those portions replayed to the jury. After being confronted with the tape recording the witness changed his testimony and testified he did not know whether Hulsebus went into the bathroom at the Christmas parties to smoke with him; that he used narcotics with Hulsebus many times, and more particularly at the first Christmas party, and he involved many others who were excluded in his direct testimony, including appellant Dere. Appellants contend the witness was being impeached on collateral or immaterial matters, that it was not damaging to the prosecution and accordingly it was improper. We see no merit to this argument. The

prosecution may question its own witness with respect to prior statements to refresh his memory where, as found by the court, it has been and is damaged by the testimony given. (*People* v. *LeBeau,* 39 Cal.2d 146, 148 [245 P.2d 302]; *People* v. *Spinosa,* 115 Cal.App.2d 659, 664 [252 P.2d 409].)

Appellant also claims the court overemphasized the importance of the statement by allowing the prosecution to rerun the record for the jury's benefit. It was the court's function to see that the jurors understood and heard all of the evidence properly admissible, and it cannot be said, for the reasons stated, that the court erred in allowing it to be rerun. In ruling on the admissibility of the statement, the court told the jury that it was allowing the admission of such evidence upon the claimed surprise of the district attorney, and that the statements were adverse and prejudicial. Appellants allege misconduct in these comments under the claim that it amounted to an instruction that the court deemed the testimony of the witness false and not worthy of belief. No objections were made to the statement at the time and no request was made to advise the jury concerning it. The court did thereafter instruct the jury it was not concerned with the reason for any ruling made by the court and they were the exclusive judges of the effect and value of evidence. No prejudicial error resulted. (*People* v. *Amaya,* 40 Cal.2d 70, 78 [251 P.2d 324].)

The record does show that after Charles Drake testified, counsel for defendants asked him if he knowingly entered into a conspiracy to commit the acts charged. The court sustained an objection to the question. Had this been one of the defendants testifying in his own behalf, the question would have been proper. (*People* v. *Becker,* 137 Cal.App. 349 [30 P.2d 562]; 10 Cal.Jur. p. 832, § 117.) This was a prosecution witness and the cross-examination was limited to the testimony brought out on direct examination. He was, however, allowed to testify that he did not "intend" to enter into any such claimed conspiracy. Appellant Dere did not testify. Accordingly, as to him, no such question was propounded and disallowed by the court. Such a question was asked of defendant Hulsebus. It was properly allowed and he answered in the negative. No prejudicial error resulted.

Objection is made to the court allowing certain recordings of statements of certain defendants, claiming they contained certain hearsay evidence which might involve these appellants, citing *People* v. *Foote,* 48 Cal.2d 20 [306 P.2d

803]. While there were certain small portions of these statements which did contain some hearsay matter, the court admonished the jury that each statement was admissible only against the defendant making it. Furthermore, they were not necessarily damaging against these appellants since there was an abundance of competent evidence establishing the facts related, and no miscarriage of justice resulted. (*People* v. *Tarantino*, 45 Cal.2d 590, 597 [290 P.2d 505] ; *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

A more serious question arises pertaining to certain exhibits which were discussed by the witnesses and displayed to the jury but refused admission under the search and seizure exclusionary rule set forth in *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905]. They involved certain evidence obtained in the search of appellant Dere's apartment. The prosecution placed on the witness stand a chemist. He was asked if he had with him certain items turned over to him by the officers. They were marked Exhibit 23 for identification, in one group. They were contained in a bag full of various articles, including bottles, containers, etc., as well as a hypodermic kit and equipment. Over a general objection, the witness testified he examined them for opium or opium derivatives and found evidence of it. An inspector of the State Bureau of Narcotics furnished samples of marijuana cigarettes, opium, heroin, and a makeshift hypodermic outfit, described them in detail to the jury, their manner of use in a general case, and their particular effect on individuals. These samples were received in evidence for the limited purpose of showing the nature of the substances involved. Without objection, the witness identified Exhibit 23 (marked for identification) and, over objections testified they were the average articles found in a person's possession who used opium. Thereafter, the officers testified they had been informed by the victim, as well as others, that appellant Dere possessed narcotics in his apartment; that they had been aware of his use and activities regarding narcotics for a long time; that they suspicioned he had been harboring the victim Jo Ann in that place; that they started searching for Dere and the girl and called at his apartment; and that Dere told them no one by the name of Sam (Dere) lived there. Jo Ann had told the officers she had spent three days at Dere's apartment; that he had supplied her with narcotics; that he had a hypodermic outfit hidden in the apartment stove. They saw she had needle marks on her arms. Later that day the officers returned, knocked at

the door and Dere admitted his identity, said Jo Ann had been in his apartment, and that he had given her some money for clothes and told her to get out. The officers later returned to the apartment and found the door padlocked. As they walked down the alley they met Dere. One officer searched him and asked him to get in the car. He did so. They told him they had Jo Ann in custody and wanted to search his apartment. They had no search warrant. The officer testified Dere knew them and that he shrugged his shoulders and said it was "O.K." One officer stated he thought he advised Dere he was under arrest, but did not remember if he stated the charge. Another said he thought it was for contributing to the delinquency of a minor, although Dere was not booked on that charge, and also for possession of narcotics and paraphernalia for its use. The officers and Dere went to Dere's apartment where they last saw him. After seeing the door was padlocked Dere was asked if he had something in there he did not want the officers to see, such as narcotics. Appellant Dere responded he was not afraid to let them see it but he had just moved upstairs to another apartment. They questioned him as to where it was and he led the officers to it, unlocked the door and motioned them in. They then made a search of the apartment. Most of the testimony of the officers leading up to the search and as to what was found in the apartment was taken in the absence of the jury upon the offer in evidence of Exhibit 23 for identification and over general and specific objections to its reception under the rule stated in the Cahan case. The articles thus identified were found in the kitchen and around the apartment. Defendant there admitted ownership. There was no testimony contrary to what the officers related in connection with the search, and accordingly there was no conflict in the evidence. The trial court was of the belief that appellant Dere invited the search or at least authorized it, but since there had been, at the time of trial, but few decisions amplifying or further construing the effect of the Cahan case, the judge was of the belief that the federal rule applied, and consent could not be freely given when the prisoner was under arrest at the time. Accordingly, he sustained the objection to the admission in evidence of the proffered exhibit and subsequently told the jury that it was not admitted in evidence. He advised it at great length and in some detail, to disregard the exhibit and all the evidence relating thereto. The claim is that the admission of this testimony and a display of the exhibit to the jury was so highly prejudicial that no admonition to disregard it could erase

the undoubted effect of it from the minds of the jurors. They rely upon *People* v. *Brophy,* 122 Cal.App.2d 638 [265 P.2d 593]. It is the prosecution's contention that the uncontradicted evidence shows, as a matter of law, consent or invitation of appellant Dere to the search; that it was incident to a lawful arrest; and accordingly it was authorized, citing *People* v. *Michael,* 45 Cal.2d 751, 753 [290 P.2d 852] ; *People* v. *Martin,* 45 Cal.2d 755, 761 [290 P.2d 855] ; and *People* v. *Smith,* 141 Cal.App.2d 399, 401 [296 P.2d 913].

It appears to us that the uncontradicted testimony as to the actions of appellant Dere and the officers might well be considered an invitation or consent to the search, even though he may have been under arrest at the time. (*People* v. *Lujan,* 141 Cal.App.2d 143, 147 [296 P.2d 93] ; *People* v. *Burke,* 47 Cal.2d 45, 48 [301 P.2d 241].) Furthermore, there was, on the part of the officers, every reason to believe, from recent and reliable sources, that appellant Dere was in the possession of narcotics and paraphernalia, and that he was being arrested on this charge. Accordingly, a reasonable search was proper. (*Trowbridge* v. *Superior Court,* 144 Cal.App.2d 13 [300 P.2d 222] ; *People* v. *Tarantino,* 45 Cal.2d 590 [290 P.2d 505] ; *People* v. *Dixon,* 46 Cal.2d 456, 458-459 [296 P.2d 557].) Since the court refused the admission of the exhibit and ordered the jury to disregard the testimony in respect thereto, at the time when the question was properly raised, no prejudicial error can be claimed, particularly when the remaining testimony fully supports the conviction. There appears to be no bad faith on the part of the prosecuting attorney in first offering proof of the character of the substance found before offering it in evidence over the objections made. No prejudicial error appears.

In appellants' closing brief, for the first time, and on argument before this court, they raise the question as to the constitutionality of the statute involving one of the charges in the information. It is predicated upon the decision in *Bonwell* v. *Justice Court,* 148 Cal.App.2d 906 [307 P.2d 716], decided since the perfection of this appeal [hearing in the Supreme Court denied May 1, 1957]. It is here claimed that a conspiracy to commit an act, based upon a statute declared to be unconstitutional, cannot stand. There is merit to the claim. (*Pacific Indem. Co.* v. *Myers,* 211 Cal. 635, 645 [296 P. 1084] ; *Norton* v. *Shelby County,* 118 U.S. 425 [6 S.Ct. 1121, 30 L.Ed 178].)

The holding in the Bonwell case was that a charge based

solely upon section 11556 of the Health and Safety Code, making it unlawful "to visit or to be in any room or place where any narcotics are being or have recently been unlawfully smoked or used," was unconstitutional, since it prohibits citizens from entering such a place innocently, or without knowing its character. ■ In the instant action appellants are charged in indictment Number 7384, count one, with conspiring to violate section 11501 by encouraging Jo Ann to violate section 11556, *supra,* declared to be unconstitutional. That section being unconstitutional, there can be no criminal conspiracy to violate a statute which does not state a crime or public offense. (Pen. Code, § 182, subd. 1; Pen. Code, § 183; 5 Cal.Jur. p. 504, § 8.)

That portion of the judgments resulting from the conviction of appellants on Count One of Information Number 7384 is reversed. The remaining portions of the judgments are affirmed. Orders denying new trials affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied May 28, 1957, and the petition of appellants Sam Dere and Robert Hulsebus for a hearing by the Supreme Court was denied July 10, 1957.