[Crim. No. 7122.   Second Dist., Div. One.   Sept. 14, 1960.]

THE PEOPLE, Respondent, v. ELMER NORMAN
BROWN et al., Appellants.

Elmer Norman Brown, in pro. per., Alfred James Hill, in pro. per., and Raymond Arthur Hart, in pro. per., for Appellants.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

FOURT, Acting P. J.—This is an appeal by each of the appellants from a judgment upon a verdict of guilty of conspiracy to violate sections 11532 and 11531 of the Health and Safety Code and section 182, subdivision 1, Penal Code in violation of the provisions of section 182, Penal Code.

In an indictment filed in Los Angeles County on October 27, 1959, the defendants were charged with conspiracy in that they did on or about August 1, 1959, and continuously thereafter to October 20, 1959, among other things, combine and agree together to use Alice Faye Waddell, a minor person of the age of 17 years, in unlawfully transporting, selling and peddling narcotics and in unlawfully selling narcotics to Alice Faye Waddell, a minor. In the indictment 22 overt acts in pursuance of the conspiracy were set forth.

The appellants were represented by counsel and upon motion of each appellant counsel was released and each appellant substituted himself as his own attorney. Each appellant pleaded not guilty.

The jury found each defendant guilty as charged. The motions of Brown and Hill for a new trial were denied. Probation was denied to each appellant.

A résumé of some of the facts is as follows:

Miss Waddell, aged 17 years, worked from time to time prior to August 27, 1959, in cleaning the house of Brown, 249 E. 76th Street, near the intersection of San Pedro Street, Los Angeles. Miss Waddell smoked marijuana 25 or 30 times and had seen it in bulk form. She saw Hill and Hart at Brown's residence. About the second or third time she was at the place she saw Brown wrap up some marijuana. On a later occasion she saw Brown give some marijuana in a bag to Hill. On another occasion she asked Brown if she could buy some marijuana from him. She testified as to her experiences and as how she felt after using marijuana. After she stopped working at Brown's, she stopped in at his house from time to time and talked with Brown and others. On

August 27, 1959, she had a talk with the defendant Love in front of his house on 117th Street. Love was keeping company with Miss Waddell's niece, Shirley. He asked Miss Waddell if she knew where he could get some marijuana and she stated that she did and agreed to get it for him. They drove together to Brown's house at her direction and she went inside the house and saw Hill. She asked Hill if she could get a half of a can of marijuana. Hill said she could and sold it to her for $6.00 which Miss Waddell paid with money which Love had given to her. Upon returning to the car with the marijuana, she gave it to Love and he put it in his pocket. When they arrived at his residence she left.

On September 3, 1959, Miss Waddell talked with Love at his residence. He asked if she could get another half can of marijuana and she said she could. She telephoned Brown, dialing a number with a PL prefix, asked if she could come by and he answered in the affirmative. She and Love drove to Brown's house and she went inside and saw Brown and Hill. In the kitchen she told Hill she wanted some marijuana and Hill agreed to give it to her. She gave him $12 of which $6.00 was hers and $6.00 belonged to Love. Hill gave her a package containing the can of marijuana. Upon returning to Love she gave him half of the contents of the can and retained half for herself. She rolled her half of the marijuana into cigarettes, smoked some of them and experienced the sensations of a marijuana smoker.

About September 12, 1959, Miss Waddell had another talk with Love at his house during which she was asked if she could get a half can of marijuana. She called Brown by telephone and asked him for a half can of marijuana. Brown offered to deliver it to her at Love's home. She gave Brown $6.00 in exchange for a package containing a half can of marijuana.

On September 25, 1959, Miss Waddell telephoned to Brown's house from a booth in the vicinity of Love's house. Hill answered the telephone and she asked for Brown. She asked Brown if he would bring a half can of marijuana to the corner near Love's house; Brown did deliver the same. She gave Brown $6.00 in exchange for the marijuana. She rolled the contents of the package, which to her knowledge was marijuana, into cigarettes and smoked the same.

On September 27, 1959, Miss Waddell was with Love and a person known as "Sonny." "Sonny" was looking for a half can of marijuana. She volunteered to get it for him.

She telephoned Brown and asked him to deliver a half can of marijuana. He did so and she paid Brown $6.00 in exchange for the marijuana. She then gave the marijuana to Love to give to "Sonny."

On September 29, 1959, Miss Waddell went to Brown's house before noon and Brown and Hill were there. She asked Hill out of Brown's presence if Hill would sell her a can of marijuana and he did so for $12. After leaving the house she smoked some of the marijuana.

On October 20, 1959, Miss Waddell came to the vicinity of Love's house. Love was with a man whom he introduced as "John." In truth the person introduced as "John" was Howard Dean, a federal undercover agent of the Bureau of Narcotics. Love asked Miss Waddell if she could get "four pounds" and "John" said he really wanted it. She asked "John" if he had the money and he said that he did. Miss Waddell went to a telephone booth and called Brown's house. Hill answered the telephone and she asked if he had 4 pounds of marijuana and he stated that he did not have such a quantity. She inquired about the cost of such an amount and was told that it would be $300. She was further told that Brown would return at 3 or 3:30 p. m. After ascertaining from "John" that the price was satisfactory she departed, stating that she would put in a call for Brown later on. About 3 p. m. she saw Love and "John" in the same vicinity and "John" introduced her to a person whose name she did not recall. That person was in fact Jayme Licuanan, a federal special agent for the Bureau of Narcotics. She called Brown's house from a telephone booth but Brown had not returned. At about 3:25 p. m. she called again and talked with Brown about the 4-pound order of marijuana. Brown stated that he would have to talk with her and that he would join her shortly. She went inside Love's house with Love and "John." Licuanan waited outside in an automobile. In about an hour Miss Waddell who was then seated on the porch of the house with Love and "John," saw Hart drive up. Brown was with him. Love and "John" went inside the house while she went up to the passenger side of the automobile in which Brown and Hart were seated. They talked together and she asked Brown in effect if he could make the sale and he said he would. When she inquired as to whether he had the marijuana with him, he stated that he would have to go get it and would return in a few minutes. She reported on the conversation to Love and "John." In about half an hour Hart

and Brown returned. Miss Waddell and "John" went up to the car. "John" asked if he could see "it." Brown told "John" to get into the car and he did so. The car was then driven away. In a few minutes, as Miss Waddell was talking to Licuanan on the porch of Love's house the auto with Hart, Brown and "John" in it returned. Love went to the car. Miss Waddell saw Hart and Brown and "John" standing outside of the car. Another car drove up at which time Miss Waddell ran inside Love's house and hid. She was then later found and arrested.

Licuanan testified that he was contacted by telephone by "John" about noon of October 20, 1959. After a meeting at the Federal Building Licuanan and "John" drove to Love's house in the middle of the afternoon. Licuanan parked the car. Love and Miss Waddell approached and Licuanan was introduced to them as "Sal." Love told them to wait a few minutes—that they were expecting the man with the marijuana. Licuanan asked about the price and Love said it would be $300 for 4 pounds. Love and Miss Waddell went to a telephone booth where she apparently made a telephone call after which she went into the house. Love came to the car and told Licuanan and "John" that Brown was not home but that they would call later. "John" and Love sat on the front porch while Licuanan stayed in the automobile. Licuanan saw Hart drive up in a Plymouth car with Brown as a passenger and park in front of the Love house. Miss Waddell went to the automobile after which the automobile then left and she returned to the house. After 6 p. m. Licuanan saw the Plymouth car return with Hart and Brown in it and "John" got into the car and it drove away. Licuanan talked to Miss Waddell and she said in effect that "John" was checking to see if they had the marijuana. When the car returned "John" got out and Licuanan asked him if he had the "stuff" and "John" answered yes. Licuanan then went to the driver's side of the car and told Hart that he had the money and asked where the "stuff" was. Hart pointed to a paper bag between himself and Brown which Brown then held up. Licuanan put Brown and Hart under arrest and Hart started to move the car. Licuanan drew his gun and Hart stopped. Brown was told to pick up the bag which he did, and, he then gave it to Licuanan who took custody of it. The bag contained a substantial quantity of marijuana.

At about 9 p. m. that night Licuanan, with other officers, went to Brown's house. Licuanan had Brown's brief case.

Licuanan knocked on the door and a Mr. Holland answered. Licuanan said that he had a brief case and that "Norman" (Brown) had told him to bring it to the house. Holland called for "Alfred." Hill came up and opened the screen door. The persons in the house were then placed under arrest. The police showed their credentials.

Howard Dean or "John," a federal undercover narcotic agent and postal employee, testified that he was dressed in street clothes on October 20, 1959, and was on the street attempting to find persons connected with the use or sale of narcotics. He met Love who said he could obtain some marijuana. Love indicated to Dean that he knew someone who could get about one and one-half cans of marijuana and that Dean should meet him in about 45 minutes at a stand on Compton and Imperial Streets. Dean called his employers and advised them of his findings and then met Love at the appointed place. Love told Dean to wait and that he would be back. Dean telephoned agent Licuanan and about noon-time Love returned. The contact which Love had intended to make was not completed. Love then mentioned Alice Waddell and stated that she was his niece and she could get marijuana from a fellow named "Norman" (Brown). Dean and Love drove to the vicinity of Love's house and met Miss Waddell. She then undertook to purchase about 4 pounds of marijuana as Dean had requested. She called on the telephone and inquired if "Norman" was there and apparently learned that "Norman" would be in later and found from Dean that a price of $400 was satisfactory. When her telephone call was finished she told Dean to return between 3 and 3:30 p. m.

Dean then went to the Bureau of Narcotics located in the Federal Building and talked to agents Licuanan and Goven. Licuanan drove him back to the rendezvous. At Miss Waddell's request Dean and Love went into the house. Licuanan waited outside in the car. He further testified to the arrival of the Plymouth car, of being driven by Hart with Brown as a passenger, and as to what then occurred. At the Hart car Brown indicated that he could get more marijuana for Dean by going to his (Brown's) house. Dean also related the occurrences which took place just before the arrest of Hart and Brown.

Officer Greenlee, a deputy sheriff of the narcotic detail, testified that he had the area around Love's house under surveillance on October 20, 1959, that he saw the comings

and goings of the parties heretofore described and that he assisted in the arrest of Brown and Hart and the search of the Love premises. Miss Waddell was found in the Love house and was placed under arrest A marijuana cigarette was found in a pocket of a jacket hanging in the front room closet which jacket was identified as one being worn by Love. The arrestees were taken to the Firestone Station. Greenlee talked with Miss Waddell and after an exchange of information with other officers, Greenlee, Licuanan and Dean, among others, went to Brown's house. The knock at the door was answered by a Mr. Holland. A Mr. Fuller was also there. Hill approached from within the house and opened the door. Greenlee then told the occupants of the house that they were under arrest and a search took place. On a kitchen table a paper bag was found which contained marijuana.

The officers had no search warrant but they had sufficient probable cause to believe that an offense was being committed at the house; that Brown or someone else had marijuana or other narcotics at the residence of Brown.

None of the appellants testified in his own behalf.

Appellants contend that: (1) their rights were infringed; (2) that the search of Brown's house was unlawful; (3) that the indictment was invalid; (4) that the evidence was insufficient and (5) that the prosecution witnesses were not credible.

In considering the first contention of the appellants, it must be remembered that this court cannot consider matters which are outside of the record (*People* v. *Collins,* 117 Cal.App.2d 175, 182 [255 P.2d 59]); that matters within the record must be sufficiently specified (*People* v. *Shannon,* 110 Cal.App.2d 153, 155 [241 P.2d 1007]), and that error will not be presumed on appeal. (*People* v. *Farrara,* 46 Cal. 2d 265, 268 [294 P.2d 21].)

Appellants assert that some religious writings were removed from the Brown house. However, no reporter's transcript reference is made to any such an occurrence and even if some religious matter was confiscated it is not pointed out in what way that might have affected the outcome of the present charges.

Reference is made to something about Hill's being denied the right of free speech at a preliminary hearing. The case before us arose out of an indictment and any matter having to do with a preliminary hearing, if any there was at

some other time, is not before us nor is it indicated how such matter adversely affected the outcome in this case.

Appellants further claim that their bail was excessive. However, there is no showing that they took the proper steps pursuant to Penal Code, section 1289, to have the bail reduced nor do they show how the matter of bail adversely affected the outcome of the case.

The appellants also complain that they were arrested on October 20, 1959, and held for eight days before being indicted. The indictment was filed on October 27, 1959, and no showing is made as to how the trial was adversely affected by any act committed or omitted from the date of their arrest.

They further assert that false evidence was introduced. The record belies any such contention.

The appellants received a fair trial. (See *Lisenba* v. *California*, 314 U.S. 219, 236 [62 S.Ct. 280, 290, 86 L.Ed. 166, 180] ; *People* v. *Collins, supra,* 117 Cal.App.2d 175, 181.)

The search of Brown's house was perfectly proper under the circumstances. No useful purpose would be served in restating the facts, but suffice it to say that there was ample probable cause for the arrest of Hill at Brown's house and the search of the premises which search uncovered a bag of marijuana on the kitchen table. (*People* v. *Ames,* 151 Cal. App.2d 714, 722 [312 P.2d 111].)

Further, no objection was made when the marijuana in question was received into evidence, and objection to the evidence and the manner in which it was obtained was thereby waived on appeal. (*People* v. *Close,* 154 Cal.App.2d 545, 552 [316 P.2d 1019].)

As to the invalidity of the indictment, appellants complain because of an amendment of a date therein. The amendment was proper and no defect is demonstrated. (*People* v. *Gordon,* 71 Cal.App.2d 606, 610-611, 629, 634 [163 P.2d 110].)

The conspiracy was established by overwhelming evidence. Appellants assert that Miss Waddell was never hired but she was certainly "used" as contemplated in the statute and as set forth in the indictment. She was utilized as the intermediary repeatedly in the marijuana sales.

In *People* v. *Burton,* 91 Cal.App.2d 695, 708 [205 P.2d 1065] it is set forth:

"In proving the conspiracy herein charged it was not necessary for the State to prove that the parties actually came

together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole.''

As stated in *People* v. *Drake,* 151 Cal.App.2d 28, 39 [310 P.2d 997] :

''. . . Common design is the essence of conspiracy, and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to some of them, if their actions are consistently leading to the same unlawful result.'' (See *People* v. *Drake, supra,* 151 Cal. App.2d 28, 33-40; *People* v. *Winston,* 46 Cal.2d 151, 154-157 [293 P.2d 40] ; *People* v. *DePaula,* 43 Cal.2d 643, 646-648 [276 P.2d 600].)

Insofar as the conspiracy had to do with the violation of section 11532, Health and Safety Code, Miss Waddell's testimony required no corroboration as in the case of an accomplice as she was a minor and the person specified in the indictment. (*People* v. *DePaula, supra,* 647-648; *People* v. *Drake, supra,* 28, 42.)

Insofar as the conspiracy had to do with the violation of section 11531, Health and Safety Code, Miss Waddell's testimony was amply corroborated. Hill was linked to the marijuana in the kitchen at the Brown house from where the sales had been made.

The credibility of the witnesses was a matter for the jury. Appellants assert that there were certain inconsistencies in the testimony. We have read the entire record and we have found nothing which would require a reversal.

In *People* v. *Collins, supra,* 117 Cal.App.2d 175, 180 it is stated:

''. . . The weight to be given to the testimony and the credibility of witnesses are matters for the jury and their finding upon such matters cannot be set aside on appeal unless it can be shown that there was no evidence which as a matter of law would justify the conviction. (Citations.)

The asserted inconsistencies in the testimony . . . do not affect the general finding of the jury as to the sufficiency of the evidence generally to support the conviction.''

598

The orders denying the motions for a new trial in the cases of Brown and Hill are affirmed.

The judgment as to each appellant is affirmed.

Lillie, J., and Scott (Robert H.), J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.