[Crim. No. 5693.   Second Dist., Div. One.   Mar. 13, 1957.]

THE PEOPLE, Respondent, v. DORIS OVERMAN,
Appellant.

Doris Overman, in pro. per., and Forno & Umann for Appellant.

Edmund G. Brown, Attorney General, William E. James and N. B. Peek, Deputy Attorneys General, for Respondent.

FOURT, J.—This is an appeal from a judgment of conviction and from the denial of a motion for a new trial. An information was filed in Los Angeles County on February 17, 1956, wherein the defendant was, in substance, charged in count I with a violation of section 337a, subdivision 1, Penal Code, in that she did engage in bookmaking of horse races on January 4, 1956; and in count II thereof she was charged with a violation of the same section of the same code, subdivision 6 thereof, in that she did on the same day as above set forth, accept bets and wagers upon horse races. A motion was made to set aside the information, which was denied, and the defendant thereupon pleaded not guilty. A jury trial was waived and it was stipulated that the People's case in chief "be submitted to the Court on the transcript of the evidence taken at the preliminary hearing, the Court to read and consider that transcript as though the witnesses therein named appeared and testified in this court under oath in like manner as their testimony was given at the time of the preliminary, the Court to receive and consider in evidence, subject to objections, the evidence received at the preliminary and that thereafter either side, if they so elect, may present further testimony."

The court found the defendant guilty as charged, and denied a motion for a new trial. Imposition of sentence was suspended and the defendant was placed on probation for three years, a part of the terms of which were that she was to pay a fine of $250 in certain installments, and that she seek reputable employment, and not engage in further bookmaking activities.

The facts of the case are substantially as follows: Officer H. C. King of the Los Angeles Police Department, who had been with the police department about eight years and was familiar with the manner in which bookmaking was conducted in Los Angeles and had made about 150 arrests for bookmaking, about the middle of December, 1955, received information from a fellow officer that the telephone at the number PL 5-9117 was being used for bookmaking by a person named "Doris." Officer King checked the number through the telephone company records, which showed that it was listed to L. E. Overman, 427 West 91st Street, the defendant's father. In the latter part of December, 1955, King called the telephone number in question twice and asked for Doris on each occasion, and a female voice answered each time, saying, "This is Doris."

On January 4, 1956, at about 2:55 o'clock p. m., King again called the same telephone number and again a female voice, similar to the voice he had heard on the two previous occasions, answered. The following then ensued:

"THE WITNESS: The female voice answered, 'Hello.'

"I said, 'Is this Doris?'

"The female voice then answered, 'Yes.'

"I said, 'Do you have the results of the third race?'

. . . . . . . . . . . . . . .

"The female voice answered, 'Yes. Tall Tree won it.'

"I then stated, 'Who placed?'

"The female voice then answered, 'Tee Man placed, and Bull Bern showed.' She then asked, 'Who is this?'

"I stated, 'This is Bill.'

"The female voice then stated, 'O.K., Bill.'

"I then stated, 'In the sixth, give me two across on Full Tide.'

"To this she stated, 'All right, thank you, Bill,' and hung up."

Immediately following the above quoted testimony the deputy district attorney asked: "Now, at this time, Officer King, as you proceeded to the address, and after making that phone call, could you tell the Court what you felt the significance of that phone call was, what it meant?"

Counsel for the defendant then said: "Now, if your Honor please, this is a matter subject to expert testimony. The words are plain English, and he stated they were, and it is outside the purview—the necessity of expert testimony."

It would seem perfectly apparent that the attorney meant to add the word "not" between the words "matter" and "subject."

The magistrate then stated, for some reason, that, ". . . I am receiving the officer's statement solely for the purpose of determining whether or not there was probable cause for him to believe that a felony was being committed, . . . ; and not on the actual question of innocence or guilt. . . ."

Immediately upon finishing the telephone call just related, King with his partner, Officer Sergeant Stephenson, went to the defendant's house, arriving there in about five minutes. Stephenson knocked on the door, which was very shortly thereafter opened by the defendant's mother. King identified himself and placed her under arrest. She started to close the inner door, but King entered by pulling the catch or hook off of the screen door and pushed open the inner door.

King found the defendant in the bathroom, where she was standing over the toilet bowl, from which flames were arising. The material which had just been burned was unidentifiable and constituted mere ash residue upon its being burned up. King arrested her for bookmaking and asked her what she was burning, and she answered by saying, "that she was burning some old bills that she didn't want lying around." About 20 to 30 minutes later she told King that she was "getting rid of her own bets; that she knew of a person who was a friend of hers who got in trouble because she had bets written down." She stated that she lived in the house with her mother and father.

King stated that he recognized the defendant's voice as being the voice he had heard on the three telephone conversations. In the house he found the telephone with the number PL 5-9117.

King remained in the house for about an hour, during which time there were about 12 to 15 telephone calls. On one of the occasions, upon the telephone ringing, King answered it, but the caller, who asked for Doris, became suspicious and hung up A policewoman was called for and Policewoman Campbell came to the house. She was there about half an hour and answered the telephone about five times. The first and third callers asked for Doris, and upon Officer Campbell's saying she was Doris, the callers hung up. The second, fourth and fifth callers placed bets or wagers, as is evidenced by the following conversations:

### Second Conversation

"A. I answered the phone. The male voice said, 'I would like to speak to Doris.'

.   .   .   .   .   .   .   .   .   .   .   .   .

"I said, 'This is Doris,'

"He said, 'It doesn't sound like Doris.'

"I told him that I had laryngitis.

"He stated, after a little bit of discussion about whether I was Doris or not, that he would like to have 'Postillion in the 6th, Grover in the 7th——'

.   .   .   .   .   .   .   .   .   .   .   .   .

" '——Grover in the 7th, and Suits Us in the 8th, and ten to win on each.'

"I asked him who this was. He said, 'Oh, you know me, Doris.'

"He then put a child on the phone. It sounded like a little girl. She said, 'Hello, Doris. What are the results?' She said that she hoped I would be feeling better."

### Fourth Conversation

"THE WITNESS: At 3:25 a male voice who identified himself as Lee, No. 1—he said—oh, first of all, he asked for Doris. I said that this was Doris. He then said that he was Lee No. 1. In the 6th, he asked for Will Star, two to win two to place.

"In the 8th, he asked for Sunny Khal, two to win, two to place.

"And he wanted a two to win, two to place parlay on both.

"The same voice said that he would like to place a bet for Jim No. 1: In the 6th, Will Star, two across—and that was it.

"That was the end of that conversation."

### Fifth Conversation

"A. At approximately 3:27 P. M. a female voice identified herself as Irene, and showed some concern as to whether I was Doris or not. I partially convinced her. She stated that in the 7th she would like to place a bet on Don Lark—however, she became suspicious again and hung up the phone.

"A. Did you answer any other calls?

"A. Yes. At 3:29 the same female voice called back and questioned as to whether I was Doris or not."

After the witness Campbell completed repeating the conversations above set forth, Officer King was recalled to the stand and asked whether he had heard the witness relate them, whereupon the following ensued:

"MR. HUNTINGTON (Counsel for appellant): Those are incompetent and immaterial.

"THE COURT: Yes.

"What is the purpose of that, whether he heard it or not?

"MR. KLEIN (Deputy District Attorney): I would like to ask him if he formed any opinion as to what those conversations were about, your Honor.

"THE COURT: Oh, he had already placed the woman under arrest, hadn't he. What purpose does it serve now?

"MR KLEIN: To prove the commission of a felony, your Honor.

"MR. HUNTINGTON: He is only hearing one side of the conversation.

"THE COURT: I think that is for the Court to determine. The objection is sustained."

Officer King was then asked the question ". . . did you form any opinion as to the phone call that you placed prior to the arrest?" which precipitated the following discussion between the Court and both counsel:

"MR. HUNTINGTON: If your Honor please, I object to that as incompetent, irrelevant and immaterial, and no——

"THE COURT: Sustained.

"It isn't a question of his opinion. It is for the Court—the Court will determine whether the offense was committed or not from the facts.

"MR. KLEIN: Officer King, as an expert in bookmaking, is he not allowed to testify that he was placing a bet, or that the phone call concerned the making of a bet? I felt that that was the purpose of expert testimony, your Honor, to assist the Court in arriving at its decision.

"THE COURT: I do not think that sufficient foundation has been laid here for this, and I do not think that it is necessary to have his opinion on this phone call.

"MR. KLEIN: That there was not sufficient foundation for his phone call?

"THE COURT: Has it been stipulated here yet that the officer is an expert on what constitutes bookmaking practices in Los Angeles County?

"MR. HUNTINGTON: No, I didn't stipulate to that.

"THE COURT: I did not think you had—I do not think you have.

"MR. KLEIN: I believe that the record will show that I asked him some preliminary questions at the beginning in hopes of qualifying him as an expert.

"MR. HUNTINGTON: Well, if your Honor please, your Honor, I believe, correctly stated the proposition. It wasn't subject to, the man said, I did a certain thing. Your Honor is the expert as to whether or not that qualifies—not as to what he thinks it does.

"THE COURT: I think so.

"MR. HUNTINGTON: It is as if I held up a man, and he saw me do it, and then you were to ask him, 'In your opinion was he holding him up?'

"THE COURT: Yes.

"MR. HUNTINGTON: I don't think that is subject——

"THE COURT: I think it is for the Court to determine from the facts.

"The objection is sustained as to his opinion."

King then stated that, among other things, he found the

sports section of the Los Angeles Examiner of January 4, 1956, the Mirror-News of January 3, 1956, and the Daily Racing Form of January 4, 1956, on the dining room table. The two newspapers had pages listing the horses entered in various race tracks throughout the country and the form contained the names and past performances of each horse in each race of the day. Officer King testified that he was familiar with the paraphernalia commonly used by bookmakers in Los Angeles County, and expressed the opinion that such papers are used by bookmakers for the purpose of assisting in the making of bets.

The defendant contends that there is no evidence to sustain a finding of guilty on either count; that the corpus delicti was not established, and therefore the opinion of the officers and the admissions of the defendant were improperly received.

The defendant basically asserts that since King was not allowed to explain the significance of his telephone call to the defendant, or those of the policewoman with the third parties, the court cannot conclude that they were bookmaking calls, and therefore there was no corpus delicti shown of bookmaking and of accepting of bets, inasmuch as the only other evidence introduced was that which had to do with the Examiner, Mirror-News and the Daily Racing Form, which, although used by bookmakers, are also generally enjoyed and read in a perfectly legal manner by sportsmen generally.

We do not agree with the defendant. In our opinion, the evidence clearly established the corpus delicti of bookmaking and accepting a bet in violation of the section and subdivisions charged. (*People* v. *Graff*, 144 Cal.App.2d 199, 206 [300 P.2d 837] ; *People* v. *Tompkins*, 109 Cal.App.2d 215, 223 [240 P.2d 356] ; *People* v. *Bradford*, 95 Cal.App.2d 372, 379 [213 P.2d 37].) The facts as testified to, together with the defendant's admissions and the exhibits introduced into evidence, amply support the conviction. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Sumner*, 117 Cal.App.2d 40 [254 P.2d 598].)

It does not appear to us that any explanation of the purport of the telephone talks was required. Almost anyone of adult years, who is even casually acquainted with what goes on in the so-called "sport of kings" at the various race tracks in Southern California and elsewhere would understand what was meant by what was said in the various telephone conversations. With all of the divers advertisements

in the various mediums concerning the horse races at the several race tracks, the repeated radio announcements of the results and televising of the different races at least once each week, and with all of the propaganda about how many millions of dollars are given to charity by the race track owners, and all of the news stories of the frailties of the human beings who engage in embezzling money to "play the horses," it would be difficult to avoid coming into contact with, and having an understanding of the incidence of the race tracks and what the words meant. As was said in *People* v. *Larum,* 111 Cal.App.2d 732, at page 734 [245 P.2d 323]: "The conversations and the passing of the money would be commonly understood as wagers on horse racing, and in the absence of any explanation by defendant that the transactions had a different meaning or purpose, the court could scarcely have failed to find they were wagers. The evidence was sufficient. . . ."

Counsel for the defendant obviously thought the words used needed no expert to interpret them when he said, "The words are plain English . . . it is outside the purview—the necessity of expert testimony."

Furthermore, the judge of the municipal court (Vernon W. Hunt) who conducted the preliminary hearing and the trial judge each seemed to know what the words meant without any expert testimony and the members of this court have no doubt as to the meaning of the words without expert testimony.

The distinction between an expert and a non-expert witness has been well put by Mr. Wharton in his work on evidence, where he says: " 'The true distinction is this, the non-expert testifies as to a subject-matter readily mastered by the adjudicating tribunal; the expert to conclusions outside of such range. The non-expert gives the result of a process of reasoning familiar to every-day life; the expert gives the result of a process of reasoning which can be mastered only by special scientists.' (Criminal Evidence, 404.) " (*People* v. *Wheeler,* 60 Cal. 581, 583 [44 Am.Rep. 70].)

As heretofore indicated, the judges who had anything to do with the matter in question were qualified from their experiences in the ordinary affairs of life and they duly appreciated the purport and meaning of the words. There was no need for expert testimony. To them it was not "beyond the ken of the average layman."

■ Moreover, the defendant having prevented the People from giving any explanation, cannot now assert that the lack of explanation makes the conversations inadmissible to prove the corpus delicti. (*People* v. *Boyles,* 45 Cal.2d 652, 656 [290 P.2d 535] ; *Credit Clearance Bureau* v. *Guaranty Loan Co.,* 61 Cal.App. 528 [215 P. 104].)

The judgment, and the order denying motion for a new trial are, and each is, affirmed.

White, P. J., and Doran, J., concurred.