[Crim. No. 7109. Second Dist., Div. One. Nov. 2, 1960.]

THE PEOPLE, Respondent, v. GEORGE FRANCIS BUCK-MAN et al., Defendants; RAY D. DRUGAN et al., Appellants.

40

Paul K. Duffy and Everett H. Smith for Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Ernest E. Sanchez, Deputy Attorney General, for Respondent.

LILLIE, J.—Appellants Drugan, Chernock and LaCroix, with codefendants Reynolds and Buckman, were variously charged in four counts alleging conspiracy to commit, and violations of, the bookmaking statute. Count I charged all defendants except LaCroix with conspiracy to violate section 337a, subdivisions 1, 2 and 4, Penal Code, alleging four overt acts—occupancy of premises at—915 North Sycamore Avenue by Reynolds (No. 1), 5407 Sierra Vista Street by Buckman (No. 2), 7465 Hawthorne Avenue by Chernock (No. 3), and 3200 West Beverly Boulevard by Drugan (No. 4), with bookmaking paraphernalia for the purpose of recording or registering bets. Counts II and III charged Buckman, Reynolds, Chernock and Drugan with bookmaking (Pen. Code, § 337a, subd. 1), and occupying premises with bookmaking paraphernalia (§ 337a, subd. 2); Count IV included LaCroix alleging they recorded and registered bets (§ 337a, subd. 4). The trial court found all defendants guilty as charged. Drugan, Chernock and LaCroix appeal from the judgment of conviction and order denying motion for new trial; Buckman and Reynolds have taken no appeal.

Because of the conspiracy charge (Count I), we relate the evidence in considerable detail. Relying on anonymous information that bets were being accepted by one "Ray" Drugan, whose telephone number was DUnkirk 5-3294, at his garage, 3200 Beverly Boulevard and that he was forwarding them to HOllywood 2-8725, and on the result of an investigation showing Drugan to have the Dunkirk number, Officer Konstanturos and his partner, both experienced officers and experts in the manner and means of bookmaking as commonly conducted in Los Angeles, went to Drugan's garage on August 11, 1959, around 1:15 p.m. Konstanturos told him a complaint had been received that he was accepting and forwarding bets. Drugan denied he was a bookie but admitted he played the horses; and, handing the officer a piece of paper consisting of a betting marker bearing ink notations (Exhibit 1) which he took from his right front shirt pocket, said: "As a matter of fact, here are the horses I played this last Saturday." The notations represented the names of horses and wagers placed on them. "Chris" and "Don" appeared after some of the bets; Drugan said they were close friends with whom he had "gone in on" several bets which he forwarded to his bookie. The horses listed in Exhibit 1 ran at Del Mar and Washington Park on August 8. Asked by the officer if they could search the premises, Drugan said, "Sure, go ahead. You will

find a dozen of those things around here.'' Two pieces of paper were found on the counter next to the telephone—one bearing the name of a horse (Exhibit 2) and the other constituting a betting marker indicating the names of horses and bettors, amounts wagered, et cetera (Exhibit 3). There were also two telephones on the premises, one with the Dunkirk number. Drugan told officers that he bet often and occasionally accepted bets from friends which he then forwarded to his own bookie, whose telephone number he did not have but who called three times a day; and that the money involved changed hands by being passed in an envelope underneath the garage door. Drugan was arrested at approximately 1:30 p.m. Three days later, again at his garage, Drugan told officers that ''he had met several people that he had been doing business with for a long time while he was in jail, people that he had never seen before, people that he did not know any of the names of . . .''; and, ''the only one he recognized by the telephone voice . . . was 'Lefty' . . . 'Lefty' was the one that called him on the telephone.'' Considered in the light of Drugan's prior statement to the officer, this leads to the obvious conclusion that he in effect stated that ''Lefty'' was his bookie.

Simultaneous with the officer's visit to Drugan, and having previously ascertained that HOllywood 2-8725 belonged to George Buckman at 5407 Sierra Vista Street, a policewoman and four officers went to that location where she situated herself in a telephone booth in a drug store and the others in various positions between there and the apartment house. The policewoman called the Hollywood number which was answered by a male voice. She said, ''This is Charlene for Duke . . . I would like to place these bets . . . $3 in the fifth race on 'Purple People' and in the sixth race one across on 'Golden Emblem' and in the seventh race one across on 'Father John' ''; he answered, ''Okay'' and hung up. Keeping the telephone open, she signaled his acceptance of the bets to the chain of officers, and the last one entered the building. A few seconds later she heard the officer's voice on the telephone. Upon entering the building at 5407 Sierra Vista the officer knocked loudly on the door of the apartment belonging to George Buckman declaring he was a police officer and demanding admittance; he heard a loud thump from within and forced entry. He saw Buckman standing in the kitchen with his back to him, a telephone, and a large piece of white formica (Exhibit 4) which Buckman was busily rubbing with a wet rag. Moving Buckman away the officer saw on the table near

the formica a pencil, a radio which at intervals was giving race results, and a copy of the *National Daily Reporter* dated August 11 (Exhibit 5). Buckman was arrested around 1:39 p.m. He told officers he had been taking action there for only a couple of days; that the "office" phoned him to pick up the action; that he had never heard of the federal wagering tax stamp and that his friend "Sam" asked him to take over for him for a short time. During the time the officers were in Buckman's apartment they answered a series of five telephone calls which came in on the Hollywood number. The first call was at 1:40 p.m.; a male voice said, "Al for Duke . . . In the first at Del Mar 'Harvest Call,' two to win. In the third 'Capriosa' two to win; in the seventh, 'Father John,' two to win"; the caller thought he was laying wagers on the horses mentioned; when the officer said "Okay" the former hung up. Another like conversation occurred at 2 p.m. On the third call, around 2:05, a voice said, "Ray (Drugan) on Beverly (Boulevard) has just been busted (arrested) . . . You've got to be careful. He has a whole string of bets in his pocket and he also has your telephone number"; the officer replied, "(T)he office hasn't called me to take any of the action yet and it is getting awfully late"; and, the caller gave the number OL 4-3131, saying, "This is a place of business but don't let that bother you. When you call just ask for 'Lefty' and they will switch the call to me." At 2:07, on the fourth call, a male voice said to the officer, "This is Sam. Have the office call me as soon as they call you"; he replied, "Fine. I'll do that, but just in case they don't have your number, what is it?"; the voice answered, "NO 5-2201." The fifth call came at approximately 2:10 p.m. and the voice said, "This is 'Lefty.' Sam wants you to call him. Something is wrong." . . . and, that Sam told him "Ray over on Beverly" had been arrested.

OL 4-3131, given to the police officer by "Lefty" as his number over Buckman's telephone was that of the Universal Lumber Company at 915 North Sycamore. Two officers went to that location; one called the number on the telephone across the street. A female voice identifying the Universal Lumber Company answered. The officer asked for "Lefty," and shortly spoke to the same male voice he had heard on Buckman's telephone, who at the time identified himself as "Lefty." The officer then relayed several bets to "Lefty," signaled to his partner that "Lefty" was taking them, and the officer entered the building. The first officer continued to

place wagers over the telephone to "Lefty" until he heard his partner's voice on the telephone. The arresting officer had entered the place of business and asked for "Lefty"; he was directed to an office and saw Connie Ray Reynolds seated at a desk with a telephone receiver to his ear, writing on a piece of paper, a betting marker. (Exhibit 6.) Reynolds told the officers that he did not normally take action at that location; that he was known as both "Lefty" and "Duke," and gave some people the latter name, and, that he normally phoned in his action to HO 2-8725 (Buckman's number).

NO 5-2201, obtained by the Officer over Buckman's telephone from one identifying himself as "Sam," belonged to the Hollywood and Sunset Top Shop at 4501 Sunset Boulevard. The officers proceeded to that location; one telephoned the number and asked for "Sam," and was told by a male voice that Sam had gone home, but that "his partner, Tony, is here. You had better talk to him." Tony then spoke to the officer, who told him his name was "George," he was the phone spot operator, he was to call Sam, and he had a lot of action. Tony said, "You mean bets?" the officer said "yes," and Tony replied, "Well, give them to me." The officer did so and signaled the other officer that Tony was taking the bets; the next voice heard on the telephone was that of the officer. The latter seeing the signal, entered the premises and observed Anthony Louis LaCroix seated at a desk listening to the telephone and writing on a piece of paper, a betting marker (Exhibit 7). LaCroix said he did not take action at that location but someone called and he was writing down bets to give to Sam; that Sam's telephone was HO 9-1659 and his address was 7465 Hawthorne; and that he was not a bookmaker and had no knowledge of Sam's being one.

Three officers immediately proceeded to 7465 Hawthorne Avenue; one called HO 9-1659. A female voice answered the telephone; the officer asked for Sam; shortly he heard a male voice say, "Hello, this is Sam"; the officer said, "This is George, the phone spot operator. Has the office called you yet?" . . . and he had some action to get rid of; and, Sam said, "Give it to me." The officer gave some bets to Sam and signaled the other officers who entered the premises. They observed Sam Chernock seated talking on the telephone and writing on a piece of paper, a betting marker (Exhibit 8). Chernock told the officers he was not a bookmaker but a bettor and he was just taking a bet for a friend; that he phoned his action to HO 2-8725 (George Buckman's number)

and had been doing so for four months; and that "Lefty" (Reynolds) usually picked up and paid off the money. Another betting marker was found in his wallet.

At the trial, Drugan testified that he was in the automotive repair business, did not make any bets on August 11, had made some a week or 10 days before for himself, does not know any of the other defendants and did not talk to a person named "Lefty"; Reynolds testified he is an accountant for Universal Lumber Co., is not referred to as "Duke" but is called "Lefty," knows Chernock, played the horses, called a number August 11th to place a bet and a voice answered they were having a little trouble so he left his office number, later received a call, the party told him he wanted him to write down some information—names of people, horses and bets— and while he was doing so an officer came in and arrested him, and he did not realize what he was doing and "was more or less helping out . . ."; LaCroix testified he is a former Louisiana policeman, answered a telephone call August 11 and took a message that the caller asked him to write down and give to "Sam" as a tip, and he knows none of the defendants except Sam Chernock; and Chernock testified that he knows only LaCroix and Reynolds, has never taken a bet from anyone for the purpose of recording it with a bookie, on August 11 he received a call from a man who said he knew a friend of his, had a tip and to write it down, and as he was doing so he was arrested. Buckman did not testify.

Appellant Drugan urges that there is no evidence that he ever conspired with his codefendants, and in any event could not have done so since he knew none of them, placed no bets with them and no act was done in concert with any of them. He further argues that inasmuch as evidence of the anonymous information that he was accepting bets at the Dunkirk number on Beverly Boulevard and forwarding them to the Hollywood number (admitted only to establish probable cause) and of the telephone call received by the officer at the Hollywood (Buckman's) number informing him that "Ray" had been arrested with a whole string of bets in his pocket was hearsay and cannot be used against him, he did not make the statement to the officer that he recognized the telephone voice of "Lefty" as his bookie, and even if he did it was not connected up with the conspiracy, and there is no proof he occupied the premises with bookmaking paraphernalia for the purpose of recording and registering bets—the evidence is insufficient to support his conviction under all counts. He offers little or no

legal argument, cites no authorities and extensively argues the facts and what inferences he feels the trial court should have deduced from them.

Appellants Chernock and LaCroix contend that the evidence is insufficient to sustain their convictions in that there was no evidence of a union or joint operation of act and intent and no evidence to support any finding they engaged in bookmaking or received or recorded bets; that they were entrapped by the officers; that the conspiracy expired with the arrest of the other defendants prior to their own; and that they were convicted upon one count which had previously been dismissed at the preliminary hearing constituting double jeopardy.

Properly eliminating from our consideration proof received for specific purposes not on the issue of guilt and against only certain defendants, and viewing the evidence in the light most favorable to the judgment, we conclude that it is not only sufficient to support the conviction of each appellant on the separate violations alleged in Counts II, III and IV, but that it, with a certainty, demonstrates the guilt of Chernock and Drugan on the conspiracy charge by revealing—an incriminating chain of circumstances connecting all of the parties and their actions, proof of their obvious common purpose and plan to engage in illegal acts (Pen. Code, § 337a), and their admissions upon arrest.

Appellants' arguments are predicated mainly upon a favorable construction of the evidence viewed by them in a completely innocent light, and their acceptance of the defense testimony as true giving no recognition to the fundamental rule on appeal that this court must assume in favor of the judgment the existence of every fact reasonably deducible from the evidence and that before the judgment may be set aside it must appear that there is no substantial evidence, upon any hypothesis whatsoever, to support the conclusion reached in the court below. (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778]; *People* v. *Robinson,* 43 Cal.2d 132 [271 P.2d 865].) Defendants' testimony relative to their activities and innocent intent did nothing more than create a factual conflict which was resolved against them by the trier of fact. A mere recital of the evidence viewed in its proper light is a clear refutation of appellants' claim that it was not sufficient to support the judgment on all counts.

 Relative to the conspiracy charge, it has long been established that direct evidence is not required to prove a

common unlawful design and agreement to work toward a common purpose; the existence of a conspiracy may be inferred as well from circumstantial evidence. (*People* v. *Calhoun,* 50 Cal.2d 137 [323 P.2d 427]; *People* v. *Docherty,* 178 Cal.App.2d 33 [2 Cal.Rptr. 722]; *People* v. *Robinson,* 43 Cal.2d 132 [271 P.2d 865].) ▮ The extent of the assent of minds involved in an unlawful operation constituting a conspiracy may be, and from the secrecy of the crime, usually must be, inferred by the trier of fact from proof of the facts and circumstances which, when taken together, indicate they are parts of the same complete whole. (*Lorenson* v. *Superior Court,* 35 Cal.2d 49, 57, 58 [216 P.2d 859]; *People* v. *Bompensiero,* 142 Cal.App.2d 693 [299 P.2d 725].)
▮▮ It need not be shown that the parties entered into a definite agreement, but it is sufficient that they tacitly came to an understanding to accomplish the act and unlawful design (*People* v. *Calhoun,* 50 Cal.2d 137 [323 P.2d 427]; *People* v. *Kitchens,* 164 Cal.App.2d 529 [331 P.2d 127]); and such agreement may be inferred from the acts and conduct of the parties in mutually carrying out a common purpose in violation of the statute. (*People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17].) ▮ "Any competent evidence which tends to prove the existence of the conspiracy or any competent acts or declarations tending to show a common design is admissible." (*People* v. *Calhoun,* 50 Cal.2d 137, 144 [323 P.2d 427]; *People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17]; *People* v. *Lyon,* 135 Cal.App.2d 558 [288 P.2d 57].)
▮ The pattern or mode of operation of the business carried on by defendants and the purpose of their activities; the chain of circumstances revealing, among other things, various interconnected telephone numbers, common and known references to "Sam" (Chernock), "Lefty" (Reynolds), and "Ray" (Drugan), defendants' conduct just prior to and at the time of their arrests, articles commonly constituting bookmaking paraphernalia found in their possession (some of which were then in use by defendants), the nature of the transactions involved, and defendants' admissions more than warranted the trial court's finding that a plan and agreement existed and that the acts performed by each were in accord with, and in furtherance of, their unlawful plan and purpose. (*People* v. *Robinson,* 43 Cal.2d 132 [271 P.2d 865]; *People* v. *Stanley,* 162 Cal.App.2d 416 [327 P.2d 973].) ▮ Nor is it necessary, as urged by appellants, to prove that all of the participants knew, met or talked to each other concerning

their common purpose, or that they knowingly or directly associated with each other (*People* v. *Drake*, 151 Cal.App.2d 28 [310 P.2d 997]; *People* v. *Sagehorn*, 140 Cal.App.2d 138 [294 P.2d 1062]; *People* v. *Sorrentino*, 146 Cal.App.2d 149 [303 P.2d 859]), or knew what duties or work was being done by others involved—particularly in an operation such as this. One has only to be casually acquainted with bookmaking activities to realize their extent and nature, and the stealth with which they are carried on (*People* v. *Overman*, 149 Cal. App.2d 125 [307 P.2d 1000]; *People* v. *Larum*, 111 Cal.App. 2d 732 [245 P.2d 323]), and that more than one person is generally involved in such an enterprise in which, because of its clandestine nature, it is safer that those participating know neither what others are doing nor their identity.

"As to appellants not knowing each other and not associating with some of the codefendants, there need be no showing of direct association. (*People* v. *Sherman*, 127 Cal. App.2d 230, 236 [273 P.2d 611].) Common design is the essence of conspiracy, and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to some of them, if their actions are consistently leading to the same unlawful result. (*People* v. *Hess*, 104 Cal.App.2d 642, 674 [234 P.2d 65]; *People* v. *Jordan*, 24 Cal.App.2d 39 [74 P.2d 519]; *Blumenthal* v. *United States*, 332 U.S. 539 [68 S.Ct. 248, 92 L.Ed. 154]; *Anderson* v. *Superior Court*, 78 Cal.App.2d 22, 23 [177 P.2d 315].)" *People* v. *Drake*, 151 Cal.App.2d 28, 39 [310 P.2d 997].)

Nor do we find merit in appellant Chernock's contention that the conspiracy expired with the arrest of the other defendants prior to his arrest, excluding against him any evidence of his codefendants in furtherance of the conspiracy. It is well settled that the law fixes no time for the termination of a conspiracy. (*People* v. *Griffin*, 98 Cal.App.2d 1 [219 P.2d 519]; *People* v. *Yeager*, 194 Cal. 452 [229 P. 40].) Moreover, it is for the trier of fact to determine when a given conspiracy terminates (*People* v. *Holmes*, 118 Cal. 444 [50 P. 675]; *People* v. *Kynette*, 15 Cal. 2d 731 [104 P.2d 794]; *People* v. *Drake*, 151 Cal.App.2d 28 [310 P.2d 997]; *People* v. *Sica*, 112 Cal.App.2d 574 [247 P.2d 72]) and it is clear from the record before us that the illegal machinery put into operation by the defendants existed long prior to Drugan's arrest and continued far beyond it.

As to the separate offenses, each defendant was arrested in his place of business or residence with bookmaking paraphernalia in his possession such as is used in the course of such a business; Drugan admitted to police officers the recording and forwarding of bets, and LaCroix and Chernock were in the process of receiving and recording them at the time of their arrest, using for that purpose certain equipment and paraphernalia on the premises; and Drugan and Chernock were actively engaged in the bookmaking business, occupying premises with paraphernalia used in the course of its activities and of recording wagers. Although defendants deny the conversations and conduct ascribed to them, the credibility of the witnesses and value and effect of the evidence are matters for the trial court. The evidence that Drugan and Chernock occupied an enclosure, a garage and residence respectively, with items consisting of betting markers, pencils, telephones and the like, for the purpose of recording or receiving bets; the nature, character and significance of the papers and equipment found on the premises and in their possession, established by the testimony of experts (*People* v. *Klein,* 71 Cal.App.2d 588 [163 P.2d 71]; *People* v. *Brown,* 123 Cal.App.2d 361 [266 P.2d 805]; *People* v. *Race,* 151 Cal.App.2d 678 [312 P.2d 322]) to be the customary methods and paraphernalia of persons engaged in bookmaking and recording or registering bets; the use of such equipment by defendants as that commonly used in such activities; telephone conversations wherein the officers actually placed bets with Chernock and LaCroix who accepted and recorded same before and at the time of their arrest (*People* v. *Joffe,* 45 Cal.App.2d 233 [113 P.2d 901]; *People* v. *Kalmes,* 100 Cal.App.2d 795 [224 P.2d 408]; *People* v. *Race,* 151 Cal.App.2d 678 [312 P.2d 322]); the presence of the defendants on the premises they are accused of occupying; and their admissions concerning their bookmaking activities, all point to the conclusion that Drugan and Chernock each had paraphernalia in his possession on the premises which he was occupying for the unlawful purpose denounced by section 337a; that each had engaged in bookmaking; and that each, including LaCroix, had received and recorded bets. (*People* v. *Sakelaris,* 154 Cal.App.2d 244 [315 P.2d 902]; *People* v. *Follins,* 173 Cal.App.2d 783 [345 P.2d 64]; *People* v. *Race,* 151 Cal.App.2d 678 [312 P.2d 322]; *People* v. *Brazell,* 159 Cal.App.2d 31, 37 [323 P.2d 185].)

As to the extent of their activities in the business

of bookmaking, it is not necessary to show more than one bet, or that the parties were actually occupied or employed in making a book or string of bets. "An unbroken line of authorities hold that to constitute a violation of Penal Code, section 337a, a volume of gambling or betting is not required and that the acceptance of even a single wager in contravention of the statute will suffice." (*People* v. *Brazell*, 159 Cal.App.2d 31, 37 [323 P.2d 185].)

The claim of Chernock and LaCroix that they were entrapped by police officers cannot be sustained under California law. In the case of LaCroix the police officer told him over the telephone his name was George, that he was the phone spot operator and was to call "Sam," and that he had a lot of action. Upon responding in the affirmative to LaCroix' question concerning whether he meant "bets," LaCroix said to the officer without any solicitation or request on the latter's part, "Well, give them to me"; and the officer did so. It is obvious from the evidence that when the officer called NO 5-2201 he intended to, and believed that he would, talk to "Sam." There is no evidence that the officer had any prior knowledge of LaCroix or even desired to speak to him on the telephone, much less entrap him into taking a wager. The voice answering the number called by the officer informed him that Sam's partner Tony was there and that he had better talk to him. The officer had no choice in the matter, for immediately LaCroix' voice was heard. Had the first voice not volunteered the information that Tony was there and that he had better talk to him, and had he not relinquished the telephone to LaCroix, the officer probably would have hung up; but, confronted with the voice of "Sam's partner" the officer seized the opportunity and announced to him that he had a lot of action. True he was not George, he was not a phone spot operator and he was not asked to call Sam; but the officer did not ask LaCroix to take his action. LaCroix volunteered his willingness to accept the bets.

Similarly the officer told Sam Chernock, "This is George, the phone spot operator. Has the office called you yet?"; and that he had some action to get rid of. This also was untrue in fact, but again the officer did not ask Sam to take the action. Chernock volunteered, "Give it to me"; whereupon the officer did so.

Plainly this evidence has none of the elements of entrapment; on the contrary, it reveals an opportunity created by the defendants themselves for the officers to give them bets

over the telephone, and the defendants' eagerness to take advantage of the officer's willingness to relay to them the wagers, and accept them. This does not constitute entrapment for it is obvious that the criminal intent was already present in the minds of the defendants and that they were neither imposed upon, persuaded nor solicited by the officers in the course of their conduct. ". . . the availability of the defense [of entrapment] depends upon whether the intent to commit the crime originated in the mind of the defendant or in the mind of the entrapping officer (*People* v. *Nunn* (1956), 46 Cal.2d 460, 471 [17] [296 P.2d 813]; *People* v. *Terry* (1955), *supra,* 44 Cal.2d 371, 372 [2] [282 P.2d 19]; *People* v. *Jackson* (1954), 42 Cal.2d 540, 547 [3,4] [268 P.2d 6]; *People* v. *Braddock* (1953), *supra,* 41 Cal.2d 794, 802 [8] [264 P.2d 521]; *People* v. *Werner* (1940), 16 Cal.2d 216, 223 [4] [105 P.2d 927]; *People* v. *Makovsky* (1935), *supra,* 3 Cal.2d 366, 369 [4] [44 P.2d 536]), and that where a defendant has a preexisting criminal intent, the fact that when solicited by a decoy he commits a crime does not show entrapment (*People* v. *Malotte* (1956), 46 Cal.2d 59, 64 [4] [292 P.2d 517]; *People* v. *Terry* (1955), *supra,* 44 Cal.2d 371, 375 [4] [282 P.2d 19]; *People* v. *Braddock* (1953), *supra,* 41 Cal.2d 794, 802 [10] [264 P.2d 521]; *People* v. *Roberts* (1953), 40 Cal.2d 483, 489 [10] [254 P.2d 501])." (*People* v. *Benford,* 53 Cal.2d 1, 10 [345 P.2d 928].) There is no evidence in the case before us that the criminal design originated with the law-enforcement officers, that they implanted in the minds of an innocent person the disposition to commit an offense or that they induced its commission; but on the contrary the record shows that they merely afforded the opportunity or facility for the commission of the offense, which does not constitute entrapment. (*Sherman* v. *United States,* 356 U.S. 369 [78 S.Ct. 819, 2 L.Ed.2d 848]; *Sorrells* v. *United States,* 287 U.S. 435 [53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249]; *People* v. *Benford,* 53 Cal.2d 1 [345 P.2d 928].)

The assertion of Chernock and LaCroix that they have been placed in double jeopardy because they were tried and convicted in the superior court on a count which was dismissed at the preliminary hearing, is predicated upon an alleged inconsistency between the numbered counts in the complaint and those in the information. Since the original complaint before the committing magistrate is not a part of this record and the latter does not give sufficient information concerning the numbered counts of the complaint, of what

each consisted in relation to those alleged in the information and in what manner they were set forth, we deem any argument in this connection to be improper as embracing matters outside of the record. ▮ In any event there is no showing in the record that the defendants were convicted of any charge heretofore dismissed by the committing magistrate; assuming, however, this to be the fact, it still would raise no question of double jeopardy inasmuch as it does not apply under such circumstances. (*People* v. *Prewitt*, 52 Cal.2d 330 [341 P.2d 1]; *Ex parte Fenton*, 77 Cal. 183 [19 P. 267].) The prior dismissal, if one existed, will not bar a trial based upon a subsequent accusation charging the identical offense.

For the foregoing reasons the judgment and order are affirmed.

Wood, P. J., and Fourt, J., concurred.